## SYLVIA FLEMING ET AL. *v.* CITY OF BRIDGEPORT ET AL.
### (SC 17627)

Rogers, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued September 18—officially released December 4, 2007

*Lori Welch-Rubin*, with whom was *Alan Rosner*, for the appellant (named plaintiff).

*Barbara Brazzel-Massaro*, associate city attorney, for the appellees (named defendant et al.).

*Shelley A. White, Anne Louise Blanchard, Gregg Bass, Thomas Behrendt* and *Raphael Podolsky* filed a brief for New Haven Legal Assistance Association, Inc., et al., as amici curiae.

*Opinion*

KATZ, J. The named plaintiff, Sylvia Fleming, appeals from the judgment of the Appellate Court holding that: (1) the individual defendants James Dixon and Susie Dixon (Dixons), the owners of a multifamily house in which the plaintiff occupied an apartment, did not violate Connecticut's entry and detainer statute, General Statutes § 47a-43,[1] by requesting that the police remove the plaintiff from the apartment on May 7, 1998; and (2) the municipal defendants, the city of Bridgeport

---

[1] General Statutes § 47a-43 (a) provides: "When any person (1) makes forcible entry into any land, tenement or dwelling unit and with a strong hand detains the same, or (2) having made a peaceable entry, without the consent of the actual possessor, holds and detains the same with force and strong hand, or (3) enters into any land, tenement or dwelling unit and causes damage to the premises or damage to or removal of or detention of the personal property of the possessor, or (4) when the party put out of possession would be required to cause damage to the premises or commit a breach of the peace in order to regain possession, the party thus ejected, held out of possession, or suffering damage may exhibit his complaint to any judge of the Superior Court."

(city) and several of its police officers, were entitled to qualified immunity for allegations that they unlawfully had removed the plaintiff from that apartment on both May 7 and May 8, 1998.[2] *Fleming* v. *Bridgeport*, 92 Conn. App. 400, 404, 407, 886 A.2d 1220 (2005). The Appellate Court affirmed in part the trial court's judgment rendered in favor of all of the defendants as to the allegations pertaining to May 7, but reversed in part the trial court's judgment concluding that the Dixons had not violated § 47a-43 by having the police remove the plaintiff on May 8. Id., 410. On appeal to this court, the plaintiff claims that the Appellate Court improperly determined that the Dixons had not evicted the plaintiff forcibly and illegally in violation of § 47a-43 on May 7, and that the municipal defendants are entitled to qualified immunity for the plaintiff's claims that the police officers violated her rights under the fourth[3] and fourteenth[4] amendments to the federal constitution, and

---

[2] Carl Terry, the tenant of the apartment from which the plaintiff was removed, was also a plaintiff in this action, but he withdrew from the case before trial. We therefore refer to Fleming as the plaintiff herein. The municipal defendants in this action are the city, Sergeant Solomon Holly and Officers Garfield Burns, Juan Gonzales and David Santos, all of the Bridgeport police department. The plaintiff also originally named as defendants two other police officers, James DiPietro and Keith Ruffin, but the trial court directed verdicts in their favor at the close of evidence at trial, and the plaintiff has not contested that ruling on appeal.

[3] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[4] Section 1 of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

article first, §§ 7[5] and 9,[6] of the state constitution. We agree with the Appellate Court's determinations and, accordingly, we affirm the judgment.

The trial court found the following facts that, unless otherwise noted, are undisputed. From 1991 to 1998, the plaintiff's father, Ed Harris, lived in the second floor apartment of the multifamily house owned by the Dixons, who lived on the first floor of the premises. Approximately two years after Harris moved in, Carl Terry moved in with him. From 1993 to 1997, the plaintiff sporadically stayed with her father, primarily when she fought with one of her boyfriends. In November, 1997, after she had been beaten severely by her then boyfriend, the plaintiff moved into the apartment with her father and Terry. The plaintiff did not seek the Dixons' permission to stay in the apartment. She thereafter received mail at the apartment and paid her father or Terry $35 a week in rent. Some time in early 1998, Harris vacated the apartment, but the plaintiff stayed continuously until May 7, 1998. There was some evidence that the plaintiff had caused "disturbances" during the time that she stayed at the apartment. These disturbances were reported to the Dixons by Harris, Terry, and other tenants.

On May 7, 1998, the defendant police officers Juan Gonzales and David Santos responded to a telephone call from Susie Dixon regarding a tenant problem at 215 Read Street, the address of the second floor apartment. In the call, Susie Dixon complained of scuffling,

[5] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[6] The constitution of Connecticut, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

yelling, screaming and swearing by the plaintiff in the second floor apartment. Because these officers had responded to a previous incident in February, 1998, at that address, they were familiar with the occupants of the premises. Upon the officers' arrival, one of the Dixons told Gonzales and Santos that the plaintiff was intoxicated, that she had caused a disturbance, that she was only a guest and not a tenant of theirs, and that they wanted her removed from the property.[7] The officers then went upstairs to the apartment to investigate, where Santos first talked to Terry. Terry informed Santos that the plaintiff was a guest and that he wanted her to leave. The plaintiff told Gonzales that she and Terry were married. Terry became angry when he heard the plaintiff say this, denied that he and the plaintiff were married, and again told the officers that he wanted the plaintiff to leave. Gonzales then told the plaintiff that she had to leave because she was only a guest and that both Terry and the Dixons wanted her removed. Although the plaintiff continually questioned why she was being made to leave, she nonetheless walked with the officers out of the apartment and to the street. Once there, however, the plaintiff became angry and began yelling. After she ignored the officers' warnings to be quiet, they arrested her for breach of the peace.

On May 8, 1998, the plaintiff returned to the apartment. When the Dixons learned of her return, they telephoned the police. Officer Garfield Burns responded to the call from dispatch regarding "an unwanted person [that] the landlord wanted removed." When Burns arrived, James Dixon told him that the plaintiff was not his tenant, that she had caused a disturbance the night

---

[7] The plaintiff contends that the Dixons did not report to the police that she had caused a disturbance, but, rather, only that she was not a tenant and that they wanted her removed from the property. Although the police report regarding the May 7, 1998 incident does not reflect that the officers were told upon arriving that the plaintiff was causing a disturbance, Susie Dixon testified that she had conveyed that information to the police.

before, and that she had been arrested and removed and told not to return. Burns decided to investigate the situation and went upstairs to talk with the plaintiff and Terry. Neither the plaintiff nor Terry informed Burns that the plaintiff had occupied the premises continually for several months or that she had contributed to the rent. After investigating the situation, Burns asked the plaintiff to leave the apartment.[8] The plaintiff agreed to leave, but asked to take a shower first. She then locked herself in the bathroom for forty minutes. During this time, an additional officer, Sergeant Solomon Holly, arrived at the scene.[9] The plaintiff then went into the bedroom where she spent more than one-half hour, claiming to be getting dressed. At some point, Burns and Holly followed Terry into the bedroom, where they found the plaintiff only partially clothed. The officers then covered her and arrested her for criminal trespass and disorderly conduct.

The plaintiff thereafter brought this action against the defendants, alleging, inter alia,[10] that both the municipal defendants and the Dixons illegally had evicted her from the apartment in violation of § 47a-43 and that the municipal defendants had violated her constitutional

---

[8] The trial court did not make specific findings as to what questions Burns had asked the plaintiff during his investigation.

[9] The plaintiff disputes the trial court's finding that Burns called for an additional police officer to come to the scene. At trial, the plaintiff testified that she had gone into the bathroom, called the police, and asked for them to send a female officer to the scene. Burns testified that he did not call for Holly; nevertheless the trial court found that it was Burns who had called for backup. While this fact is not relevant to our determination of the issues on appeal to this court, we note that we have been unable to find support in the record for the trial court's finding that it was Burns and not the plaintiff that had telephoned police headquarters for an additional officer.

[10] The plaintiff raised a claim, before both the trial court and the Appellate Court, that the officers had violated § 47a-43, the entry and detainer statute. Although the plaintiff mentions this claim in her brief to this court in her recount of the procedural history, she does not discuss or brief it further. Accordingly, we do not address it herein.

rights to freedom from unlawful searches and seizures and to due process of law under the federal and state constitutions.[11] See footnotes 3 through 6 of this opinion. At the close of the bench trial, the court directed verdicts on certain counts of the complaint that are not considered here[12] and received posttrial briefs on the remaining counts. In its memorandum of decision, the court found that the plaintiff was in actual possession of the apartment from November, 1997, to May 6, 1998, but that she was not in "lawful or peaceable possession" on May 7 and 8, 1998. Thus, the trial court determined that the plaintiff had not proven that she had been ejected unlawfully by the officers on May 7 and 8. It found that the officers had asked the plaintiff to leave the apartment because she was a guest who had created a disturbance and that the plaintiff had consented to leave. The court found that the officers had conducted a sufficient investigation under the circumstances on both May 7 and 8, and noted that "on minor matters

[11] The plaintiff's fourth amended complaint alleged a laundry list of claims: violation of § 47a-43 against the Dixons (count one); violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a, against the Dixons (count two); intentional and negligent infliction of emotional distress against the Dixons (counts three and four); unlawful conversion against the Dixons (count five); malicious initiation of criminal charges that were later nolled against the Dixons and the officers (counts six and seven); violation of the plaintiff's rights under the first, fourth and fourteenth amendments to the federal constitution against the officers (count eight); violation of § 47a-43 against the officers (count nine); conspiracy to violate the plaintiff's rights under the first, fourth and fourteenth amendments to the federal constitution against both the Dixons and the officers (counts ten and eleven); violation of article first, §§ 7 and 9, of the state constitution against the Dixons and the officers (counts twelve and thirteen); negligence against the officers and the city (count fourteen); and violation of the first, fourth and fourteenth amendments against the city (count fifteen). With the exception of counts one, eight, thirteen and fifteen, these claims were disposed of at or after trial and are not before us on appeal.

[12] The trial court directed verdicts on the allegations of misconduct against Officers James DiPietro and Keith Ruffin for an incident that took place on May 14, 1998, and on the count of illegal conversion (count five) against the Dixons.

like this the police cannot devote endless time." The court thus concluded that the plaintiff had failed to prove facts sufficient to establish a violation of § 47a-43 and the state constitution against the Dixons. The court also summarily concluded that the plaintiff had failed to meet her burden as to the claims in the complaint against the municipal defendants.

On appeal to the Appellate Court, the plaintiff claimed, inter alia, that the trial court improperly had determined that: (1) the Dixons did not violate § 47a-43, the entry and detainer statute; and (2) the municipal defendants did not violate her rights under the fourth and fourteenth amendments to the United States constitution and her rights under article first, §§ 7 and 9, of the Connecticut constitution. *Fleming* v. *Bridgeport,* supra, 92 Conn. App. 402. The Appellate Court concluded that the trial court's failure to find that the plaintiff was in actual possession on May 7 and 8, 1998, was clearly erroneous. Id., 405. The Appellate Court then determined that the Dixons had not violated § 47a-43 on May 7, because the officers had removed the plaintiff primarily because Terry had requested it. Id. The court concluded, however, that the Dixons had violated the statute on May 8 because, on that date, the officers had removed the plaintiff because the Dixons had asked them to do so. Id.

The Appellate Court further determined that the municipal defendants were entitled to prevail on qualified immunity grounds with respect to the plaintiff's claims that they had violated § 47a-43 and the plaintiff's constitutional rights because the officers "reasonably could not have known that the plaintiff actually possessed the apartment" and "therefore could not have known that removing the plaintiff . . . would violate her civil rights." Id., 409. The Appellate Court, therefore, reversed the judgment of the trial court in part and remanded the case to the trial court with direction to

render judgment in favor of the plaintiff for the May 8 violation against the Dixons and to award the plaintiff $1 in nominal damages.[13] Id., 410. The Appellate Court affirmed the trial court's judgment in all other respects.

We thereafter granted the plaintiff's petition for certification to this court, limited to the following questions: (1) whether the Appellate Court properly determined that the Dixons did not violate the entry and detainer statute on May 7, 1998; and (2) whether the Appellate Court properly concluded that the police officers were entitled to qualified immunity for removing the plaintiff from an apartment where she was in actual possession. *Fleming* v. *Bridgeport*, 277 Conn. 922, 895 A.2d 795 (2006). We answer each of these questions in the affirmative.

At the outset, we note that, to the extent that the Appellate Court's decision is predicated upon the trial court's factual findings that the plaintiff disputes, we review the trial court's findings of fact under the clearly erroneous standard. *Weinstein* v. *Weinstein*, 280 Conn. 764, 775, 911 A.2d 1077 (2007). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id.

I

The plaintiff first contends that the Appellate Court improperly determined that the Dixons had not violated § 47a-43 on May 7, 1998. Specifically, the plaintiff con-

---

[13] Although the Appellate Court concluded that the Dixons' conduct on May 8 had violated § 47a-43; *Fleming* v. *Bridgeport*, supra, 92 Conn. App. 405; they have not appeared in this certified appeal, filed their own cross appeal or submitted any briefs. Accordingly, we do not address the Appellate Court's determination of the Dixons' liability for their actions on May 8.

tends that the Appellate Court improperly concluded that Terry's statement to the officers that he wanted the plaintiff to leave, and not the Dixons' original complaint, ultimately caused her removal from the apartment on that date. The plaintiff asserts that it was the Dixons, and not Terry, who had requested that the police inform the plaintiff that she would not be allowed to return. Thus, the plaintiff claims that, because the Dixons used the police as a strong hand to hold the plaintiff out of possession of the apartment, the Dixons violated § 47a-43 (a) (2) and (4).

We begin with the entry and detainer statute. Section 47a-43 provides in relevant part: "(a) When any person . . . (2) having made a peaceable entry, without the consent of the actual possessor, holds and detains the same with force and strong hand, or . . . (4) when the party put out of possession would be required to cause damage to the premises or commit a breach of the peace in order to regain possession, the party thus ejected, held out of possession, or suffering damage may exhibit his complaint to any judge of the Superior Court. . . ."

This court previously has explained: "For a plaintiff to prevail [under § 47a-43], it must be shown that he was in actual possession at the time of the defendant's entry. . . . Section 47a-43 was made to protect a person in such possession, although a trespasser, from disturbance by any but lawful and orderly means." (Internal quotation marks omitted.) *Berlingo* v. *Sterling Ocean House, Inc.*, 203 Conn. 103, 108, 523 A.2d 888 (1987). The question of actual possession is a question of fact. *Communiter Break Co.* v. *Scinto*, 196 Conn. 390, 394, 493 A.2d 182 (1985). "[T]he inquiry is whether the individual has exercised the dominion and control that owners of like property usually exercise." Id. Continuous presence is not required, but there must be

evidence of "actual physical control, with the intent and apparent purpose of asserting dominion." Id.

As the plaintiff and the amici curiae[14] point out, this court previously has identified a specific public policy underlying the entry and detainer statute—to prevent self-help on the part of landlords seeking to recover possession of the premises and to avoid the costs of the disturbances to the public that can result therefrom. *Orentlicherman* v. *Matarese*, 99 Conn. 122, 126–27, 121 A. 275 (1923). This court has explained: "There are several reasons why the law cannot suffer a forcible entry upon a peaceable possession, even though it be in the assertion of a valid title against a mere intruder: First. Whoever assumes to make such an entry makes himself judge in his own cause, and enforces his own judgment. Second. He does this by the employment of force against a peaceable party. Third. As the other party must have an equal right to judge his own cause, and to employ force in giving effect to his judgment, a breach of the public peace would be invited, and any wrong, if redressed at all, would be redressed at the cost of a public disturbance, and perhaps of serious bodily injury to the parties." (Internal quotation marks omitted.) Id.

We agree with the Appellate Court that it was clearly erroneous for the trial court to fail to find that the plaintiff still was in actual possession of the apartment at the time of the events on May 7 and 8, 1998. Indeed, the trial court found that the plaintiff continuously had occupied the premises during the time in question, that she had received mail there, and that, at least for a period of time, she had paid some rent to her father

---

[14] The following amici curiae filed a brief in support of the plaintiff's claim that the defendant police officers should not be entitled to qualified immunity: New Haven Legal Assistance Association, Inc.; Connecticut Legal Services; Greater Hartford Legal Aid; Legal Assistance Resource Center of Connecticut, Inc.; and Connecticut Legal Rights Project, Inc.

or Terry.[15] This evidence clearly demonstrates that the plaintiff exercised the type of control that a resident in possession of a dwelling would exercise.[16]

To the extent that the trial court focused on whether the plaintiff was in lawful possession on May 7 and 8, it misconstrued the proper inquiry.[17] It is well established under our case law that the legality of the individual's presence as a tenant is not at issue under § 47a-43. *Orentlicherman* v. *Matarese,* supra, 99 Conn. 126 ("[t]he actual, peaceable possession of the plaintiff, *however obtained,* could not be put an end to without some process of law" [emphasis added]). An individual who creates a disturbance or trespasses still may be in actual possession of the premises for purposes of protection under § 47a-43, even if he or she otherwise properly may be removed via the process prescribed by law for unlawful behavior. Id.

Despite the plaintiff's actual possession, however, we conclude that the record supports the Appellate Court's determination that the Dixons' conduct on May 7 did not violate the entry and detainer statute. Susie Dixon testified, and the trial court found the testimony credible, that she had telephoned the police because there were sounds of scuffling, screaming and swearing coming from the apartment and that she had wanted the plaintiff removed because of that disturbance. She made essentially that same allegation to the officers

[15] There was also testimony at trial that the plaintiff had used this apartment's address as her own for purposes of obtaining a state identification card.

[16] Indeed, counsel for the municipal defendants ultimately conceded at oral argument before this court that the plaintiff was in fact in actual possession at the time of the May 7 incident.

[17] The trial court's memorandum of decision does not make it entirely clear whether its reference to the plaintiff's unlawful possession relates to her lack of tenancy or her actions in causing a disturbance. To the extent that the trial court was focused on the plaintiff's status as a tenant, we now make clear that tenancy is irrelevant under § 47a-43.

when they arrived on the scene. There is no evidence in the record to demonstrate that Susie Dixon's claim of disturbance was a pretext to use the police to circumvent the summary process otherwise required under § 47a-43. Indeed, the trial court found, consistent with Santos' testimony, that "Terry had told Santos that he had had an argument with the plaintiff, that she was only a guest of his and he wanted her out." The plaintiff does not contend, nor could she under our case law, that the entry and detainer statute protects a possessor from being removed from the premises by the police in accordance with the criminal law for breach of the peace. See *Daddona* v. *Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 257, 550 A.2d 1061 (1988) (noting that provisions like § 47a-43 "were designed to protect . . . *peaceable possession* . . . from disturbance . . . and to protect the peace of the neighborhood" [citation omitted; emphasis added; internal quotation marks omitted]).

Although the plaintiff makes much of the fact that the police report reflected that the officers were responding to a "landlord-tenant dispute," even if that report were read in the light most favorable to her, this fact does not conflict with Susie Dixon's statement to the officers on the scene that there was a disturbance or with Terry's corroborating statements to them. Similarly, the plaintiff contends that the trial court should have credited Terry's trial testimony denying that he had told the police that he wanted her to leave.[18] The trial court, however, found Terry's testimony to be vague and not credible.[19] It is well settled that it is

[18] On the basis of the ample evidence in the record that the plaintiff, her father and Terry frequently argued and that Terry was afraid of the plaintiff, the trial court reasonably credited the police officers' testimony that Terry had told the police he wanted the plaintiff to leave.

[19] The plaintiff testified at trial and disputed the evidence that there had been any sort of disturbance or argument on May 7, 1998. The trial court also found the plaintiff's testimony to be not credible.

exclusively within the trial court's province to judge the credibility of witnesses and that appellate courts must defer to the fact finder's determinations of credibility. *State* v. *Lawrence*, 282 Conn. 141, 155, 920 A.2d 236 (2007); see also *Greco* v. *Greco*, 275 Conn. 348, 359, 880 A.2d 872 (2005) (noting that, on appeal, "[this court] cannot retry the facts or pass on the credibility of the witnesses" [internal quotation marks omitted]).

Two final observations about the record are worth noting. First, there is no evidence that, when the police arrived on the scene, the Dixons asked them to take a key away from the plaintiff or to remove her belongings from the premises. See General Statutes § 47a-43 (a) (4) (providing action "when the party put out of possession would be required to cause damage to the premises or commit a breach of the peace in order to regain possession"). Second, the trial court found that, "[o]nce Terry told both officers that he wanted her out, they asked her to leave and she left." This finding provides some support for the inference that Terry's conduct, and not that of the Dixons, was the determinative factor in the officers' decision to ask the plaintiff to leave the premises. Thus, we agree with the Appellate Court's conclusion that, on May 7, 1998, the Dixons did not violate § 47a-43 (a) (2) by effectively using the police as a "strong hand" to dispossess the plaintiff, nor did they violate § 47a-43 (a) (4) by putting the plaintiff out of possession such that she would need to cause damage to the premises (e.g., by breaking in to the apartment or by picking a changed lock) or commit a breach of the peace to reenter. See *Fleming* v. *Bridgeport*, supra, 92 Conn. App. 405.

II

The plaintiff next contends that the Appellate Court improperly determined that the municipal defendants were entitled to qualified immunity on her claim under

42 U.S.C. § 1983[20] for alleged violations of the fourth and fourteenth amendments to the federal constitution. We disagree.

Under federal law, the doctrine of qualified immunity shields officials from "civil damages liability" for their discretionary actions "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson* v. *Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). Qualified immunity "is an *immunity from suit* rather than a mere defense to liability" and, therefore, protects officials from the burdens of litigation for the choices that they make in the course of their duties.[21] (Emphasis in original.) *Mitchell* v. *Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). Thus, the United States Supreme Court has "recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the

---

[20] Section 1983 of title 42 of the United States Code provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[21] Although typically asserted before trial to avoid the burdens of litigation on municipal officials, qualified immunity may be asserted at trial or by posttrial motion as well. See *Mulligan* v. *Rioux*, 229 Conn. 716, 724, 643 A.2d 1226 (1994) (defendants reasserted qualified immunity on motion for judgment notwithstanding verdict), on appeal after remand, 38 Conn. App. 546, 662 A.2d 153 (1995); see also *Guffey* v. *Wyatt*, 18 F.3d 869, 873 (10th Cir. 1994) (noting that qualified immunity could be raised at trial because "doctrine of qualified immunity shields a defendant both from trial and from damages"); *McGee* v. *Bauer*, 956 F.2d 730, 734 (7th Cir. 1992) ("It is somewhat unusual for qualified immunity to be granted at the [judgment notwithstanding the verdict] stage, since the decisions of the Supreme Court repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation. . . . However, given the procedural history of this case, we cannot agree that [the defendant] waived his qualified immunity defense." [Citation omitted; internal quotation marks omitted.]).

public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service." *Wyatt* v. *Cole*, 504 U.S. 158, 167, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992). Whether an official is entitled to qualified immunity presents a question of law that must be resolved de novo on appeal. *Elder* v. *Holloway*, 510 U.S. 510, 516, 114 S. Ct. 1019, 127 L. Ed. 2d 344 (1994).

"A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier* v. *Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." Id.; accord *Scott* v. *Harris*, 550 U.S. 372, 377, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

Under the *Saucier* test, a court first is required to articulate the elements of a constitutional violation and, taking the facts in the light most favorable to the plaintiff, determine whether there *would* be a violation of the plaintiff's constitutional rights under those facts. *Saucier* v. *Katz,* supra, 533 U.S. 201. The principles set forth with regard to the right alleged to have been violated set the groundwork for and inform the second inquiry. Id. Under the second inquiry, the court must

determine not merely whether the state official conducted, for example, a reasonable search or seizure because qualified immunity has a "further dimension." Id., 205. Rather, a court must also determine for purposes of qualified immunity whether the officer made a reasonable mistake as to the legal constraints on his behavior under those circumstances. Id. As the Supreme Court stated in *Saucier*, the essence of the second inquiry is that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." (Internal quotation marks omitted.) Id., 202.

The Second Circuit has further refined the second inquiry under *Saucier* in a way that we find particularly helpful: "A [governmental] defendant will be entitled to qualified immunity if either (1) his actions did not violate clearly established law or (2) it was objectively reasonable for him to believe that his actions did not violate clearly established law." *Iqbal* v. *Hasty*, 490 F.3d 143, 152 (2d Cir. 2007). "In determining whether a right was clearly established, the court must assess whether the contours of the right [were] sufficiently clear *in the context of the alleged violation* such that a reasonable official would understand that what he [was] doing violate[d] that right. . . . To that end, the court should consider what a reasonable officer in the defendant's position would have known about the lawfulness of his conduct, not what a lawyer would learn or intuit from researching case law. . . . Furthermore, the court need not identify legal precedent addressing an identical factual scenario to conclude that the right is clearly established." (Citations omitted; emphasis added; internal quotation marks omitted.) Id. A right will be clearly established as long as it is foreshadowed by relevant precedent, such as decisions of the Supreme Court. *Tellier* v. *Fields*, 280 F.3d 69, 84 (2d Cir. 2000).

A

We begin with the plaintiff's fourth amendment claim. The plaintiff contends that the municipal defendants are not entitled to qualified immunity because they violated clearly established law under the fourth amendment when they effected an unlawful seizure of her property by removing her from the apartment and telling her not to return. More specifically, the plaintiff contends that "[t]here was no reasonable basis for police officers not to have known that directing a current, nontrespassor occupant to leave and not return was illegal . . . ." We disagree.

The fourth amendment protects against unreasonable seizures of an individual's property. "[T]o state a constitutional violation, the [plaintiff] must allege (1) [the officer's] conduct constituted a 'seizure,' and (2) the seizure, if one occurred, was 'unreasonable.' " *White* v. *Markham*, 310 F.3d 989, 993 (7th Cir. 2002). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States* v. *Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984); id., 120–21 (concluding that "assertion of dominion or control" by Drug Enforcement Agency agents over package with suspicious white substance that later turned out to be cocaine and destruction of small amount of that substance for testing were seizures). If a seizure has occurred, then the court must engage in a complex inquiry to determine whether that seizure was reasonable. *Soldal* v. *Cook County*, 506 U.S. 56, 61–62, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992).

With regard to the reasonableness requirement, "[i]n the ordinary case, the [Supreme] Court has viewed a seizure of personal property as per se unreasonable within the meaning of the [f]ourth [a]mendment unless it is accomplished pursuant to a judicial warrant issued

upon probable cause and particularly describing the items to be seized." *United States* v. *Place*, 462 U.S. 696, 701, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983). The Supreme Court has nonetheless "made it clear that there are exceptions to the warrant requirement. When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [c]ourt has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *Illinois* v. *McArthur*, 531 U.S. 326, 330, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001); see id., 330–31 (listing exceptions).

We note that the Supreme Court has recognized that improperly evicting an individual *can be* a seizure of property within the meaning of the fourth amendment. *Soldal* v. *Cook County*, supra, 506 U.S. 56. In that case, the defendant owners of a trailer park sought to evict a tenant and initiated eviction proceedings pursuant to Illinois state law. Id., 57–58. Two weeks before the case was scheduled to go to trial, the defendants called the deputy sheriffs to observe the eviction process. Id., 58. One deputy sheriff came to the trailer park and watched as the defendants' employees "proceeded to wrench the sewer and water connections off the side of the trailer home, disconnect the phone, tear off the trailer's canopy and skirting, and hook the home to a tractor." Id. Thereafter, two additional deputy sheriffs arrived and observed, with full knowledge that the defendants did not have the judgment of eviction necessary to remove the tenants in accordance with the Illinois Forcible Entry and Detainer Act, as the defendants' employees "pulled the trailer free of its moorings and towed it onto the street." Id., 58–59. The tenants received their trailer back, badly damaged, five days later after they prevailed in the summary process action. Id., 59.

The court held that "being unceremoniously dispossessed of one's home in [that] manner . . . [is] a sei-

zure invoking the protection of the [f]ourth [a]mendment." Id., 61. In so doing, the court clarified that the fourth amendment is meant to protect both privacy and property interests, concluding that "the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, *effect an eviction by the police*, or on a whim, for no reason at all."[22] (Emphasis added.) Id., 69. The court explained that "the reason why an officer might enter a house or effectuate a seizure is wholly irrelevant to the threshold question whether the [a]mendment applies." Id. It rejected the view that carrying the fourth amendment into this realm would intrude on areas traditionally left to the states, such as routine repossessions. Id., 71. The court underscored that the "reasonableness" of the interference with an individual's possessory interests still would be the ultimate question, a standard that would allow "numerous searches" to survive constitutional scrutiny. Id.

In the federal Court of Appeals' precedent since *Soldal*, we have found that those courts confronting situations wherein officers had removed an individual, but did not take possession or control of the apartment or home, have declined categorically to hold that such circumstances constitute a seizure within the meaning of the fourth amendment. See *Higgins* v. *Penobscot County Sheriff's Dept.*, 446 F.3d 11, 13–14 (1st Cir. 2006) (noting that lower court judge had expressed serious doubt as to whether ejection of individual from his home under threat of arrest was fourth amendment seizure, but determining that it was at least arguable

---

[22] The Supreme Court declined to review, and therefore accepted, the Court of Appeals' holding that there was state action because the involvement by deputies in the seizure had prevented the tenants from using reasonable force to protect their home from private action that the officers knew was illegal. *Soldal* v. *Cook County*, supra, 506 U.S. 60–61 n.6.

that seizure had occurred and then turning to qualified immunity test); *Thomas* v. *Cohen*, 304 F.3d 563, 583 (6th Cir. 2002) (Gilman, J., writing for the court on that issue in his concurring and dissenting opinion) (expressing doubt, but not conclusively deciding, whether ordering persons who later were determined to be tenants to leave building and escorting them out was seizure within meaning of fourth amendment), cert. denied, 538 U.S. 1032, 123 S. Ct. 2075, 155 L. Ed. 2d 1061 (2003); but see *Paster* v. *Henry*, 1995 WL 686038, *2 (E.D. Pa. November 15, 1995) (holding that police assisted eviction of plaintiffs from their apartment within one hour was unreasonable seizure within meaning of fourth amendment). In cases wherein the police have taken possession or control of property, however, courts have been more willing to conclude that it was a seizure. See, e.g., *United States* v. *James Daniel Good Real Property*, 510 U.S. 43, 51–52, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993) (recognizing that seizures in civil forfeiture context are seizures within meaning of fourth amendment); *Soldal* v. *Cook County*, supra, 506 U.S. 69 (holding that physical removal of trailer home from parcel of land constituted seizure); *Revis* v. *Meldrum*, 489 F.3d 273, 287 (6th Cir. 2007) ("[deputy's] actions in physically taking possession of [the plaintiff's] house by having the locks changed, retaining a key, and evicting [the plaintiff] demonstrably effected a seizure within the meaning of the [f]ourth [a]mendment"); *Armendariz* v. *Penman*, 75 F.3d 1311, 1320 (9th Cir. 1996) (noting that city's enforcement of alleged fake violations of housing code in order to evict tenants and board up buildings was interference with property interests cognizable under fourth amendment).

Two cases in particular are illustrative of the reluctance of courts to hold that circumstances wherein the police did not take possession or control over the premises definitively constitute a seizure within the

meaning of the fourth amendment, deciding instead to focus on the reasonableness of the interference. In *Thomas* v. *Cohen*, supra, 304 F.3d 565, the plaintiffs had occupied bedrooms in a " 'transitional shelter' " for women. While the plaintiffs were occupying the shelter, a dispute arose over alleged violations of internal rules, and the director of the shelter expressed her desire to evict them. Id., 566. The plaintiffs consulted an attorney who told them that they were tenants and could be removed only through proper eviction procedures. Id. The director of the shelter called the police, told them that the plaintiffs had violated shelter rules by using drugs and alcohol, and asked that the police evict the plaintiffs according to standard procedure. Id., 567. Police officers entered the plaintiffs' bedrooms and verbally ordered them to leave immediately. Id. The plaintiffs informed the officers that they had paid rent and offered to show them a letter from their attorney stating that they were tenants under state law. Id. The officers rejected the plaintiffs' attempts at explanation and forced them to leave. Id. The Sixth Circuit reversed the District Court's determination that the defendant police officers were not entitled to qualified immunity on the plaintiffs' fourth amendment claim. Id., 581–82. Expressing doubt that merely escorting the plaintiffs from the premises constituted a seizure, the court declined conclusively to so hold. Id., 583 (Gilman, J., concurring and dissenting). Instead, the court held that, "at the very least, a reasonable person in the officers' position would not have known that the eviction in question violated the plaintiffs' [f]ourth [a]mendment right to be free from the unreasonable seizure of their real estate interest," entitling them to qualified immunity.[23] Id.

---

[23] The court did not explain how it had arrived at this determination of reasonableness. See *Thomas* v. *Cohen*, supra, 304 F.3d 583.

Similarly, in *Higgins* v. *Penobscot County Sheriff's Dept.*, supra, 446 F.3d 12, the defendant deputy sheriff had issued a no trespass order giving the plaintiff only minutes to collect his belongings and vacate or be arrested. The defendant had done so on the basis of complaints from family members that the plaintiff had no lawful right to occupy the apartment at issue and the defendant's own observations that the apartment had showed signs of vacancy when he had driven by on prior occasions. Id., 12–13. The Court of Appeals for the First Circuit, *assuming* a fourth amendment violation, concluded that the deputy sheriff had made a reasonable determination for purposes of qualified immunity that the plaintiff was not an occupant based on the representations of the plaintiff's own family members, the defendant's observations and the plaintiff's lack of documentary proof of title. Id., 14.

We agree with the First and Sixth Circuits that we need not decide conclusively[24] in the present case whether the officers' command, without a warrant or court order,[25] for the plaintiff to leave the property and not return on May 7 and 8, 1998, was tantamount to an unreasonable seizure under the fourth amendment.[26]

---

[24] We note that a recent Supreme Court decision expresses doubt as to the order of the *Saucier* test in that it forces courts to decide difficult constitutional questions first, even when the qualified immunity inquiry is much clearer and easier to resolve. See *Scott* v. *Harris*, supra, 550 U.S. 377 n.4; see also *Brosseau* v. *Haugen*, 543 U.S. 194, 201–202, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (Breyer, J., concurring) (expressing similar doubts about *Saucier* test).

[25] The plaintiff devotes significant attention in her brief to the issue of whether the seizure could be considered reasonable because the officers had no probable cause or consent. We need not decide those issues here because we conclude that other facts demonstrate that the officers behaved reasonably under the circumstances.

[26] We emphasize again here, as we have previously, that *Saucier* clarified that the focus of the reasonableness determination in terms assessing the validity of a seizure under the fourth amendment can be distinct from the reasonableness for purposes of qualified immunity. Although we recognize that the line between these two inquiries is often difficult to discern—and, indeed, one inquiry will inform the other—the focus for fourth amendment

We conclude that, even assuming such an unreasonable seizure, the officers are entitled to qualified immunity because it was objectively reasonable for them to believe that their actions would not violate a clearly established right of the plaintiff's under the circumstances.

There is no doubt that the right to be free from an unreasonable seizure of one's home or property under the fourth amendment has long been clearly established law. See *United States* v. *James Daniel Good Real Property*, supra, 510 U.S. 52; *Soldal* v. *Cook County*, supra, 506 U.S. 69. As we stated previously herein, however, a municipal officer will be entitled to qualified immunity if "it was objectively reasonable for him to believe that his actions did not violate clearly established law." *Iqbal* v. *Hasty*, supra, 490 F.3d 152. Under the circumstances in the present case, even if the officers committed a seizure in violation of the fourth amendment, because they reasonably believed that they merely were removing an unruly guest at the request of the property owners and the tenant, Terry, they are nevertheless shielded.

The trial court found that the Dixons had complained on both May 7 and May 8, 1998, that the plaintiff was a nontenant who had created a disturbance on May 7,[27] complaints that the officers then investigated and found to be credible. What is most significant here is that, unlike in *Thomas* v. *Cohen*, supra, 304 F.3d 581, the officers made a reasonable, although perhaps not ideal, investigation of the circumstances to inform themselves of the plaintiff's status. They did not simply rely on the representations of the Dixons. On May 7, Terry's

purposes is whether the interference was reasonable; the focus for purposes of qualified immunity is whether there was a reasonable basis for the police officers not to have known that what they were doing was in violation of clearly established law.

[27] Burns testified at trial that James Dixon informed him on May 8 that the plaintiff had caused disturbances both on May 7 and in the past.

statements in response to the officers' questions that he and the plaintiff were not married, that the plaintiff was a guest and that he wanted her to leave played a significant role in the decision by Gonzales and Santos to remove the plaintiff. On May 8, the knowledge of the plaintiff's arrest the night before and the failure of Terry and the plaintiff to object or give any other further explanation on May 8 also reasonably informed the decision by Burns and Holly to remove the plaintiff again. Additionally, in contrast to the facts in *Thomas*, the plaintiff in the present case said nothing to the police about paying rent and actually living there, and did not provide any other information that would indicate that she resided at the apartment. Her failure to do so obscured any indication that the officers might have had that, by removing her, their conduct would violate the plaintiff's actual possessory interest in the apartment protected under § 47a-43. Thus, like the deputy sheriff in *Higgins* v. *Penobscot County Sheriff's Dept.*, supra, 446 F.3d 14, the officers in the present case reasonably relied on the information available to them in making their determination.

As the plaintiff points out in her brief, however: "None of the four officers charged with [the] violation of [the] plaintiff's constitutional rights appeared to know what the relevant legal standard was for determining whether an occupancy can be characterized as transient." Indeed, the officers' testimony suggested that they believed that the plaintiff would have had to be married to the lawful tenant or have lawful possession to remain in the apartment. We agree that the law is not clear as to what police officers are required to do under the fourth amendment when they are called upon to assess the possessory interest of an individual against whom landlords make a complaint, particularly when the officers' own limited investigation substantiates that there

was a disturbance on the property.[28] In the absence of exigent circumstances, adherence to the fourth amendment and to § 47a-43, and the policies underlying both, would dictate that police officers make a reasonable investigation to determine whether such persons are entitled to the protections of the statute. For example, some relevant questions to such an inquiry might be: how long the plaintiff had been staying there; whether she received mail there; whether she paid rent; whether she kept her belongings there; and whether she had a key to the premises.[29] We recognize that the officers in the present case could have asked such questions, and we urge that they do so in the future in similar circumstances; we cannot say, however, that their approach under the circumstances of this case was so unreasonable as to justify abrogation of their qualified immunity.

B

The plaintiff next claims that the defendant police officers are not entitled to qualified immunity for violating her established right to due process under the fourteenth amendment because they interfered with her possessory rights in the apartment as recognized by § 47a-43 when they removed her without resorting to the summary process required pursuant to General Statutes § 47a-23 et seq.[30] We disagree.

---

[28] We note that the officers' knowledge of the criminal lockout statute, General Statutes § 53a-214, would not be helpful in this regard, as the protections of that statute extend only to a tenant, as defined under General Statutes § 47a-1 (*l*), occupying the premises pursuant to a rental agreement, a status that the plaintiff clearly did not have.

[29] The plaintiff points out that the officers had focused on the marital status of Terry and the plaintiff. We agree with the plaintiff that the officers should not have focused on this question, although we note that under certain circumstances the marital status of the couple could be relevant, such as where one spouse has not yet established residency.

[30] General Statutes § 47a-23 (a) provides in relevant part: "When the owner or lessor, or the owner's or lessor's legal representative, or the owner's or lessor's attorney-at-law, or in-fact, desires to obtain possession or occupancy of any land or building, any apartment in any building, any dwelling unit, any trailer, or any land upon which a trailer is used or stands, and . . . (2)

As *Saucier* dictates, we begin by determining whether the plaintiff has alleged facts sufficient to demonstrate a constitutional violation. The fourteenth amendment provides in relevant part that "[n]o State shall . . . deprive any person of life, liberty or property, without due process of law . . . ." U.S. Const., amend. XIV, § 1. In order to make out a fourteenth amendment claim the plaintiff must allege: (1) a liberty or property right protected by the fourteenth amendment; and (2) that the deprivation of that interest contravened due process. See *Mathews* v. *Eldridge*, 424 U.S. 319, 332–33, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). In determining whether the individual has a protected property interest, we may look to our own state laws. *Board of Regents of State Colleges* v. *Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) ("Property interests, of course, are not created by the [c]onstitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.").

Under § 47a-43, the plaintiff had a cognizable possessory interest because she was in actual possession of the apartment at the time that the officers removed her. See *Fuentes* v. *Shevin*, 407 U.S. 67, 84–85, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972) (recognizing possessory

when such premises, or any part thereof, is occupied by one who never had a right or privilege to occupy such premises; or (3) when one originally had the right or privilege to occupy such premises but such right or privilege has terminated; or (4) when an action of summary process or other action to dispossess a tenant is authorized under subsection (b) of section 47a-23c . . . such owner or lessor, or such owner's or lessor's legal representative, or such owner's or lessor's attorney-at-law, or in-fact, shall give notice to each lessee or occupant to quit possession or occupancy of such land, building, apartment or dwelling unit, at least three days before the termination of the rental agreement or lease, if any, or before the time specified in the notice for the lessee or occupant to quit possession or occupancy."

interests as cognizable under fourteenth amendment). Furthermore, when such an interest created by law is at stake, the most basic requirement of procedural due process is, as Connecticut law provides under § 47a-23, notice and an opportunity to be heard.[31] Id., 80–81. Because it is undisputed that the plaintiff had no process whatsoever before being deprived of her possessory interest on both occasions, we turn to the question of whether the officers are entitled to qualified immunity.

It cannot be doubted that the right to process, as provided for by statute, before a deprivation of one's valid possessory interest in one's home has been clearly established for some time now. See, e.g., *United States v. James Daniel Good Real Property*, supra, 510 U.S. 53–54; *Fuentes v. Shevin*, supra, 407 U.S. 80. In *Thomas v. Cohen*, supra, 304 F.3d 581, the Sixth Circuit concluded that, while "[t]he qualified immunity doctrine generally encompasses judgmental errors," the officers were not entitled to qualified immunity for a fourteenth amendment claim when they had failed to undertake any investigation to resolve whether the plaintiffs were tenants and entitled to process before being evicted. It was this "unwarranted failure" to investigate that led to the court's determination that the officers were not entitled to qualified immunity. Id. The facts in the present case, however, are different from *Thomas* in a significant way. The officers did conduct a reasonable, albeit cursory, investigation of the plaintiff's status. Terry expressly stated to the officers that the plaintiff was a guest who was no longer welcome on May 7 and said nothing to contradict that on May 8. Had there been credible evidence to the contrary, we would have expected the officers to make a more thorough investigation before removing the plaintiff, even if they ulti-

---

[31] The municipal defendants do not argue that any exigent circumstances justified their actions.

mately had to do so temporarily because she was causing a disturbance. As we have stated in part II A of this opinion, had it been more apparent that the plaintiff was a resident, or had the officers merely relied on representations of the landlord without conducting an independent investigation, our determination regarding qualified immunity might be different. Because that is not the case here, we conclude, for many of the same reasons that we did with respect to the fourth amendment claim, that the defendant officers also are entitled to qualified immunity because their mistake as to the constraints of the fourteenth amendment was objectively reasonable under these circumstances.

## III

The plaintiff next claims that the Appellate Court improperly concluded that the officers were entitled to governmental immunity with regard to her claim that they violated article first, §§ 7 and 9, of the Connecticut constitution. Specifically, the plaintiff contends that the defendants may be held liable for their actions because (1) the circumstances should have made it apparent to the officers that their removal of her would subject her to imminent harm or (2) they acted with malice. We disagree.

Under Connecticut common law, the test to determine whether a municipal employee is entitled to governmental immunity for discretionary acts is distinct from the federal inquiry and requires separate consideration. *Mulligan* v. *Rioux*, 229 Conn. 716, 728, 643 A.2d 1226 (1994), on appeal after remand, 38 Conn. App. 546, 662 A.2d 153 (1995). Put simply, a municipal official is otherwise generally immune from liability for discretionary—as opposed to ministerial—acts, unless the plaintiff can show that the circumstances fit under one of three exceptions: "first, where the circumstances make it apparent to the public officer that his or her

failure to act would be likely to subject an identifiable person to imminent harm . . . second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws . . . and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." (Internal quotation marks omitted.) Id.; *Doe* v. *Petersen*, 279 Conn. 607, 615–16, 903 A.2d 191 (2006); see also General Statutes § 52-557n.

As a preliminary matter, we note that the plaintiff does not dispute that the officers' acts were discretionary and that governmental immunity would otherwise apply. The plaintiff asserts that the present case falls under the first or the third exception to immunity for such acts.

A

Under our case law, when "the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable [or foreseeable] person to imminent harm," the public officer is not entitled to qualified immunity. (Internal quotation marks omitted.) *Burns* v. *Board of Education*, 228 Conn. 640, 645, 638 A.2d 1 (1994). Foreseeability is the touchstone of our analysis in determining whether a public officer can be liable for his discretionary acts under this exception. *Durrant* v. *Board of Education*, 284 Conn. 91, 101, 931 A.2d 859 (2007); see also *Purzycki* v. *Fairfield*, 244 Conn. 101, 108 n.5, 708 A.2d 937 (1998) ("[t]he ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised" [internal quotation marks omitted]). Thus, we will permit official liability for discretionary acts only if "the public official's duty to act is [so] clear and unequivocal that the policy rationale underlying discretionary act immunity—to encourage municipal officers to exercise judgment—has no force." (Internal

quotation marks omitted.) *Durrant* v. *Board of Education,* supra, 106. The issue of governmental immunity is a question of law, over which we exercise de novo review. *Doe* v. *Petersen,* supra, 279 Conn. 613.

The plaintiff first claims that the officers' failure to "ascertain the correct legal standard" subjected her to the imminent harm of the loss of her residence. In *Doe* v. *Petersen,* supra, 279 Conn. 616, we noted that "[b]y its own terms, this test requires three things: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." All three of these factors are intimately tied to the question of foreseeability, and all must be met for a plaintiff to overcome qualified immunity. Id., 620. A review of several of our cases analyzing this exception demonstrates why the plaintiff's claim fails.

In *Doe,* we focused on the third requirement that the circumstances make it apparent to the public official that his action would cause a specific person harm. Id., 620–21. The plaintiff sued the town of Wethersfield on the basis of an allegedly negligent response of one its employees, William Pitkin, to the plaintiff's complaint that she had been sexually assaulted by James Petersen, the supervisor of a town tennis program, in which the plaintiff was enrolled as a teenager. Id., 609–10. The plaintiff had approached Pitkin about Petersen's inappropriate behavior but never managed to inform Pitkin expressly that there had been a sexual assault. Id., 610. Thus, because this essential piece of information was not known to Pitkin, we concluded that the circumstances did not make it apparent to him that his failure to respond to the plaintiff's concerns would subject her to distress. Id., 619–20. Because the three requirements for exception are analyzed conjunctively, the plaintiff's failure to establish the one requirement meant that we did not reach the other two. Id., 620.

In *Shore* v. *Stonington*, 187 Conn. 147, 150–51, 444 A.2d 1379 (1982), the plaintiff brought suit on behalf of his decedent, who was killed by a drunk driver. The plaintiff alleged that a police officer had been negligent in failing to detain the drunk driver when the officer stopped the driver earlier in the evening. Id. The police officer had observed the driver operating his vehicle at a fast pace and crossing over the center line of the highway a few times. Id., 150. This court concluded that the circumstances were not such that it would have been apparent to the officer that his failure to act would have subjected that specific person, the decedent, to imminent harm. Id., 153–54.

Finally, in *Sestito* v. *Groton*, 178 Conn. 520, 521, 423 A.2d 165 (1979), the plaintiff administratrix sought damages on behalf of the decedent who had been fatally wounded in a shooting that was witnessed by the defendant police officer. The officer had driven by and seen a small crowd of men scuffling and shoving in a parking lot, which he easily could have entered to intervene. Id., 523. He heard gunshots and called into the police station but, by the time he entered the lot, the decedent had been shot and fatally wounded. Id. The plaintiff brought an action in negligence against the officer. Id., 521–22. The trial court directed a verdict for the police officer and accordingly rendered judgment in his favor. Id., 522. This court reversed the judgment, concluding that there was sufficient evidence on the question of whether the officer, under the facts presented, owed a specific duty to the individual, i.e., the decedent, to let the question go to the jury. Id., 527–28.

Turning to the facts of the present case, as we repeatedly have stated herein, the circumstances on May 7 and 8, 1998, obscured the fact that the plaintiff was in actual possession of the premises. In accordance with the reasoning of the cases we have cited herein, the plaintiff did not inform the officers of, and no other

source made clear, the most critical piece of information that would have made it apparent that the plaintiff would have been subject to the alleged imminent harm: that she was an occupant with no other place of residence. Instead, Terry told the officers just the opposite in terms of her status as a guest. Thus, we conclude that, like in *Doe* and *Shore*, nothing made it *apparent* to the officers that the plaintiff would have been subject to any harm.

Again, we underscore that the officers might have asked more pertinent questions of the plaintiff to ascertain her status as a resident. We also recognize, however, that given the evidence before the officers, their "duty to act [was not so] clear and unequivocal that the policy rationale underlying discretionary act immunity—to encourage municipal officers to exercise judgment—has no force." (Internal quotation marks omitted.) *Durrant* v. *Board of Education*, supra, 284 Conn. 106. These are, indeed, the situations in which we want to encourage police to use their discretion in order to parse as carefully as possible between the extremes of an unwanted guest that is causing a criminal disturbance and a peaceable actual possessor whom the landlords are endeavoring to use the police to evict.

B

Finally, the plaintiff claims that the officers' conduct was so unreasonable that it rose to the level of malicious conduct, or, in the alternative, that it was malicious because the officers lacked probable cause. Both claims lack merit.

A showing that officers acted with malice such that they are not entitled to qualified immunity is a heavy burden. Mere negligence is not enough. See *Evon* v. *Andrews*, 211 Conn. 501, 505, 559 A.2d 1131 (1989). For example, in *Mulligan* v. *Rioux*, supra, 229 Conn. 731–33, this court concluded that a jury finding that the defen-

dant officials had engaged in malicious prosecution satisfied the test for this exception to qualified immunity. The court reasoned that, because the jury had found on the malicious prosecution claim that the defendants had "acted primarily for an improper purpose; that is, for a purpose other than that of securing the proper adjudication of the claim on which [the proceedings] are based," the malice exception to qualified immunity also was satisfied. (Internal quotation marks omitted.) Id., 732.

As we previously have stated, the defendant police officers' conduct in this case, while not ideal under the circumstances, was objectively reasonable, and therefore, does not rise remotely close to the level of inappropriateness necessary to create an inference of malice. The trial court found that on both May 7 and 8, the officers had conducted an investigation of the circumstances by interviewing all of the relevant parties—the Dixons, Terry, and the plaintiff—before making a determination. On the basis of their investigation and observations, the officers made the reasonable determination to remove the plaintiff from the premises. There is no evidence in the trial court's findings or in the record as a whole of any improper motive on the part of the officers.

Additionally, the plaintiff has not provided any authority, nor has our research revealed any, for the proposition that we can infer malice solely because of a lack of probable cause. See id., 739 ("[p]robable cause has been defined as the knowledge of facts sufficient to justify a reasonable [person] in the belief that he [or she] has reasonable grounds for prosecuting an action" [internal quotation marks omitted]). At best, a lack of probable cause could be evidence of an improper motive. In this case, however, even if we were to determine that the officers lacked probable cause on either occasion to remove the plaintiff from the premises,

there is no evidence that the officers acted with any improper motive.

For all of these reasons, we conclude that the municipal defendants are entitled to qualified immunity under the common law for the plaintiff's claims that the police officers' actions on May 7 and 8 violated article first, §§ 7 and 9, of the state constitution.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.