******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ADELE P. EDGERTON, SUCCESSOR CONSERVATOR
(ESTATE OF WALKER HOPKINS) *v.* TOWN
OF CLINTON ET AL.
(SC 19095)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Espinosa, Js.

Argued September 26, 2013—officially released March 18, 2014

*Aaron S. Bayer*, with whom were *Julie Loughran* and *Lawrence A. Ouellette, Jr.*, and, on the brief, *Michael P. Thompson*, for the appellant (named defendant).

*Steven D. Ecker*, with whom were *M. Caitlin S. Anderson*, and, on the brief, *Gavan F. Meehan*, for the appellee (substitute plaintiff).

*Opinion*

ZARELLA, J. The principal issue in this appeal is whether the named defendant, the town of Clinton (town),[1] is shielded from liability under the doctrine of governmental immunity because it would not have been apparent to Ellen Vece, a 911 dispatcher employed by the town, that her acts or omissions would have been likely to subject Walker Hopkins to imminent harm. Hopkins' injuries occurred as a result of the second of two vehicle collisions on August 5, 2005, in Clinton. First, at approximately 9:15 p.m., a dark red Infiniti driven by William Cardillo struck the side of a vehicle driven by Matthew Vincent, a volunteer firefighter and security guard at Clinton Crossing Premium Outlets (Clinton Crossing). Vincent pursued the Infiniti in his vehicle with blue courtesy lights flashing for nearly three miles at forty to fifty miles per hour over winding, residential roads. The Infiniti eventually crashed into a tree, and Hopkins, a passenger in the Infiniti, suffered severe injuries. During the course of the pursuit, Vincent calmly relayed information about the Infiniti and its location to Vece[2] via cell phone. Vincent did not inform Vece that he was driving in excess of the speed limit or that he had engaged his blue courtesy lights.

The substitute plaintiff, Adele P. Edgerton, successor conservator of Hopkins' estate (plaintiff),[3] claimed, inter alia, that the town was liable for Hopkins' injuries under General Statutes § 52-557n (a) (1) (A).[4] At trial, the jury found the town liable under the identifiable person-imminent harm exception to governmental immunity because the circumstances would have made it apparent to Vece that her failure to act would have been likely to subject an identifiable person to imminent harm. The jury further found that Vece's failure to act was a proximate cause of Hopkins' injuries. As a result, the jury attributed 90 percent of the negligence to Vece and ultimately awarded the plaintiff $12,713,612.97 in damages.[5] On appeal, the town claims that it should not be held liable under the identifiable person-imminent harm exception to the doctrine of governmental immunity because the circumstances would not have made it apparent to Vece that her failure to instruct Vincent to stop following the Infiniti likely would have subjected Hopkins to imminent harm. The town further argues that, even if the exception does apply, Vece's failure to act was not a proximate cause of Hopkins' injuries. The plaintiff counters that the identifiable person-imminent harm exception does apply and that Vece's failure to act was a proximate cause of Hopkins' injuries. We agree with the town and, accordingly, reverse the judgment of the trial court with respect to the town.

The jury reasonably could have found the following relevant facts. On August 5, 2005, Hopkins was a passenger[6] in the dark red Infiniti, which was driven by Car-

dillo. At approximately 9:15 p.m., Cardillo was slowly making a left hand turn at the intersection of Route 81 and Glenwood Road in Clinton when his vehicle swerved and hit the rear left quarter panel of Vincent's car. After this initial collision, Vincent stopped, but Cardillo proceeded to drive away on Glenwood Road at approximately twenty miles per hour. Vincent then continued on Glenwood Road, pursuing the Infiniti at approximately forty to fifty miles per hour. The route consisted of winding, narrow, residential roads with speed limits of twenty-five or thirty miles per hour. This pursuit lasted for nearly three miles.

At some point during the pursuit, Vincent turned on blue courtesy lights, with which his car was equipped because he was a volunteer firefighter. Blue courtesy lights, which are similar to police lights, are intended to be used when a volunteer firefighter is responding to a fire or a medical emergency. An eyewitness stated that, at one point during the pursuit, Vincent's vehicle and the Infiniti were less than two feet apart and Vincent's vehicle had its "hazards on or flashers on . . . ." After Vincent had been following the Infiniti for between four and five minutes, the Infiniti collided with a tree and caught on fire. As a result of this second collision, Hopkins sustained serious injuries, including a closed head injury and traumatic brain injury. Following their arrival at the accident scene, the police issued Vincent a citation for the improper use of his blue courtesy lights.

While Vincent was following the Infiniti, he relayed information regarding the Infiniti and its location to Vece via cell phone. Vincent initially called 911 when he realized that Cardillo was not going to stop after the initial collision occurred. Vincent and Vece knew each other well and had communicated more than 100 times about security issues at Clinton Crossing. During the 911 call, Vincent's tone was calm and collected. When Vece answered the call and asked if it was an emergency, Vincent calmly responded: "Yes, it is." He informed her that he "just got hit by a motor vehicle" and that the vehicle "took off . . . ." He also told Vece that he was "trying to catch up to [the vehicle] to get [the license] plate [number]." When Vece asked where Vincent was, he continuously provided her with information on his location and the location of the Infiniti. Approximately thirty-six seconds into the 911 call, Vincent provided Vece with the license plate number of the Infiniti. After another few minutes, Vincent gave Vece a more detailed description of the Infiniti, including its model name and color. Importantly, the audio recording of the 911 call revealed that there were no outside noises to indicate that Vincent was driving at an excessive rate of speed. Moreover, there was nothing in the conversation between Vincent and Vece during the 911 call to indicate that Vincent had been using his blue courtesy lights while he was following the Infiniti.

Approximately three minutes into the 911 call, Vincent informed Vece that the Infiniti had "just taken off and [was] going at a high rate of speed . . . [u]p Ironworks [Road]." Vincent then said that he did not "know how fast [he] want[ed] [to go] to try to catch up to [the Infiniti]." Vece replied that the police "[knew] who it [was]." At trial, Vece explained that there was no reason for Vincent to continue following the Infiniti at that point because the police were aware of the identity of the driver of the Infiniti. Approximately ten seconds later, Vincent exclaimed that Cardillo "just wrecked it" by "roll[ing] the car" and that "[t]he car [was] on fire."[7]

Hopkins required permanent care as a result of his injuries, and an action was filed on his behalf on May 16, 2006, against the town, among others, pursuant to § 52-557n (a) (1) (A). The town responded that the action was barred by the common-law doctrine of governmental immunity and § 52-557n (a) (2).[8] The plaintiff filed an amended complaint on March 18, 2010. The town and the defendant Clinton Volunteer Fire Department (fire department) moved for summary judgment on March 29, 2010, which the trial court denied.

The jury found in favor of the plaintiff on January 25, 2011. Specifically, the jury found that (1) Vece was negligent and that her negligence was a proximate cause of Hopkins' injuries, (2) an exception to governmental immunity applied because the circumstances would have made it apparent to Vece that her failure to act would have been likely to subject an identifiable person to imminent harm, (3) Hopkins was not negligent and did not cause his own injuries, (4) Vincent was negligent and that his negligence was a proximate cause of Hopkins' injuries, and (5) Cardillo was negligent and that his negligence was a proximate cause of Hopkins' injuries. The jury apportioned 90 percent of the negligence to Vece, 5 percent to Vincent, and 5 percent to Cardillo.

On March 11, 2011, the town filed a motion for remittitur or for a new trial, and a motion for a directed verdict, for judgment notwithstanding the verdict, or to set aside the verdict. The town claimed, inter alia, that (1) the plaintiff's claim was barred by the doctrine of governmental immunity because the evidence did not support the application of the identifiable person-imminent harm exception, and (2) the evidence failed to establish that Vece's acts or omissions were the actual or proximate cause of Hopkins' injuries. The town further argued that the jury's determination that Vece was 90 percent responsible for Hopkins' injuries "so shock[ed] the conscience that the jury clearly was influenced by sympathy, prejudice, mistake or partiality." On July 22, 2011, the trial court denied the motions and rendered judgment in accordance with the jury verdict. The town filed a motion to reargue, which the trial court denied. The town appealed to the Appellate Court from the trial court's judgment on August 5, 2011.

The trial court issued an articulation on January 6, 2012. In this articulation, the trial court stated that the identifiable person-imminent harm exception to the governmental immunity doctrine applied because Vece already knew the license plate number of the Infiniti, the pursuit was of a limited duration, the parties were in a specific geographic location, and there were only a small number of people involved. The trial court thus concluded that the circumstances would have made it apparent to Vece that her failure to instruct Vincent to stop the pursuit would have been likely to subject Hopkins to imminent harm. The trial court further stated that the plaintiff had adduced sufficient evidence to establish that Vece's negligence was the proximate cause of Hopkins' injuries. On that same date, the town filed with this court a motion to transfer the appeal from the Appellate Court to this court, which we granted on January 15, 2013.

On appeal, the town claims that the identifiable person-imminent harm exception does not apply in the present case and thus it is shielded from liability under the doctrine of governmental immunity. Although the town does not contest the identifiable person or imminent harm requirements of the exception, the town argues that a jury reasonably could not have found that the circumstances would have made it apparent to Vece that her failure to act would have been likely to subject Hopkins to imminent harm. The town argues that the only facts relevant to a determination of apparentness are what Vece knew at the time of the 911 call. The town further claims that the plaintiff did not submit enough evidence for the jury reasonably to find that Vece's failure to act was the proximate cause of Hopkins' injuries. The plaintiff counters that the identifiable person-imminent harm exception to governmental immunity applies in the present case because circumstances would have made the risk of imminent harm to Hopkins apparent to Vece. The plaintiff also argues that the jury properly found that Vece's failure to act was the proximate cause of Hopkins' injuries. We agree with the town.

We begin our analysis with the applicable standard of review. "The defendant must overcome a high threshold to prevail on either a motion for a directed verdict or a motion to set aside a [verdict]. Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff." (Internal quotation marks omitted.) *Hicks* v. *State*, 287 Conn. 421, 432, 948 A.2d 982 (2008).

The present case requires us to determine whether the town is immune from liability under the doctrine

of governmental immunity. "[T]he ultimate determination of whether qualified immunity applies is ordinarily a question of law for the court . . . [unless] there are unresolved factual issues material to the applicability of the defense . . . [where] resolution of those factual issues is properly left to the jury."[9] (Internal quotation marks omitted.) *Purzycki* v. *Fairfield*, 244 Conn. 101, 107–108, 708 A.2d 937 (1998). We therefore exercise plenary review over the issue of whether the identifiable person-imminent harm exception to governmental immunity applies.[10] See, e.g., *Fleming* v. *Bridgeport*, 284 Conn. 502, 532–33, 935 A.2d 126 (2007).

"[Section] 52-557n abandons the common-law principle of municipal sovereign immunity and establishes the circumstances in which a municipality may be liable for damages."[11] (Footnote omitted.) *Doe* v. *Petersen*, 279 Conn. 607, 614, 903 A.2d 191 (2006). "One such circumstance is a negligent act or omission of a municipal officer acting within the scope of his or her employment or official duties. . . . [Section] 52-557n (a) (2) (B), however, explicitly shields a municipality from liability for damages to person or property caused by the negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law."[12] (Citation omitted; internal quotation marks omitted.) Id.

Affording immunity to municipal officers performing discretionary acts serves the policy goal of avoiding "expansive exposure to liability," which "would cramp the exercise of official discretion beyond the limits desirable in our society." (Internal quotation marks omitted.) Id. "Discretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury. . . . In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion. . . . This is because society has no analogous interest in permitting municipal officers to exercise judgment in the performance of ministerial acts." (Citations omitted; internal quotation marks omitted.) Id., 615.

This court has recognized an exception to discretionary act immunity that allows for liability when "the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . ."[13] (Internal quotation marks omitted.) Id., 616. This identifiable person-imminent harm exception has three requirements: "(1) an imminent harm; (2) an identifiable victim; and

(3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." Id. All three must be proven in order for the exception to apply. See id., 620.

The plaintiff and the town agree that the only requirement at issue in the present case is whether it would have been apparent to Vece that her failure to act would have subjected an identifiable person to imminent harm. In order to meet the apparentness requirement, the plaintiff must show that the circumstances would have made the government agent aware that his or her acts or omissions would likely have subjected the victim to imminent harm. See id., 618–20. This is an objective test pursuant to which we consider the information available to the government agent at the time of her discretionary act or omission.[14] See id., 620; see also *Fleming* v. *Bridgeport*, supra, 284 Conn. 534–35 (government officials were not apprised of "the most critical piece of information that would have made it apparent that the plaintiff would have been subject to the alleged imminent harm"). We do not consider what the government agent could have discovered after engaging in additional inquiry. See *Doe* v. *Petersen*, supra, 279 Conn. 616–17, 619–20 n.11; *Fleming* v. *Bridgeport*, supra, 535. Imposing such a requirement on government officials would run counter to "the policy goal underlying all discretionary act immunity, that is, 'keeping public officials unafraid' to exercise judgment."[15] *Doe* v. *Petersen*, supra, 616. "It surely would ill serve this goal to expose a public official to liability for his or her failure to respond adequately to a harm that was *not* apparent to him or her." (Emphasis in original.) Id., 616–17.

In *Doe*, the plaintiff, Jane Doe, alleged that she was sexually assaulted when she was fifteen years old by an instructor in a tennis program offered by the town of Wethersfield. Id., 609–10. The assault allegedly occurred when the instructor offered to drive Doe home after the program was cancelled due to a thunderstorm. Id. A few days after the assault, Doe approached the instructor's supervisor to speak with him about the incident. Id., 610. Specifically, Doe testified: "I told [the supervisor] that I needed to talk to him about something that had happened a couple [of] nights earlier between me and . . . [the instructor]. And [the supervisor] stopped and he said okay. Was this during tennis, something to that effect. And I said actually, no, the night of the big storm, they closed the park and he offered me a ride home, only he didn't take me home. And I don't think I got much past that, just my anxiety level, he immediately started, you know—he immediately made me feel that he was very nervous with what I was trying to say. And he said, [h]old on a second, hold on a second, this is something the two of you [have] got to work out. It's obviously a misunderstanding. I'm not going to get involved. Work it out." (Internal quotation marks omitted.) Id. Doe brought an action against the

town of Wethersfield for carelessness and negligence, and against the instructor for assault, negligent infliction of emotional distress, and intentional infliction of emotional distress. Id., 610–11. The town of Wethersfield filed a motion for summary judgment on the ground that Doe's claims against it were barred by governmental immunity. Id., 611.

We agreed, reasoning that the supervisor "had no knowledge of the assault, and [Doe] did not apprise him of it." Id., 619. Therefore, it could not have been "apparent" to the supervisor that his acts or omissions would have been likely to subject Doe to a risk of harm. Id., 620. Doe argued that she was unable to inform the supervisor of what had occurred because the supervisor "cut [her] off from any further explanation . . . ." (Internal quotation marks omitted.) Id., 619 n.11. Nonetheless, we concluded that, even if this allegation were true, our analysis would not change because the supervisor "still would have [had] no knowledge of the assault, and the record [did] not reflect any other possible basis on which to conclude that the risk of 'terror and long term psychological injury' to [Doe] would have been apparent to [the supervisor]."[16] Id., 619–20 n.11. We thus decided that the supervisor's conduct did not fall within the purview of the identifiable person-imminent harm exception to discretionary act immunity. Id., 620.

Similarly, in *Fleming*, this court concluded that the identifiable person-imminent harm exception to governmental immunity did not apply. See *Fleming* v. *Bridgeport*, supra, 284 Conn. 535. In that case, the plaintiff, Sylvia Fleming, was in actual possession of an apartment but did not inform the police officers, who were called to remove her, of her status as a resident. See id., 534–35. The court specifically determined that the police officers who removed Fleming despite her status as a resident were entitled to governmental immunity because the risk of harm to Fleming was not apparent to them. See id., 535. Although the court acknowledged that the police officers "might have asked more pertinent questions of [Fleming] to ascertain her status as a resident," it did not consider what the officers could have discovered. Id. Rather, the court considered the evidence available to the officers at the time of their discretionary act in determining that their duty to act was not "clear and unequivocal . . . ." (Internal quotation marks omitted.) Id.

As the court did in *Doe* and *Fleming*, we examine the record in the present case to determine if there is any possible basis on which to conclude that it would have been apparent to Vece that her actions likely would have subjected Hopkins to imminent harm. The only possible basis on which Vece could have become aware of such harm was through her conversation with Vincent during the 911 call. During that conversation, how-

ever, Vincent was calm, collected, and rational, his voice was "level and steady," and he did not "sound excited . . . ."[17] There were no background noises in the form of squealing tires or gusting winds to indicate high speeds on winding roads. There was therefore nothing in the first four minutes of the 911 call to alert Vece that Vincent was speeding or driving aggressively.[18] Furthermore, Vece would not have known that Vincent was improperly using his blue courtesy lights, as there is nothing in the audio recording of the 911 call to alert her to this fact.[19]

In addition, although Vece never specifically asked Vincent whether he was exceeding the speed limit, she was not required to do so under our decisions in *Doe* and *Fleming*. In *Doe*, the supervisor *could* have asked Doe more questions when she began to confide in him. See *Doe* v. *Petersen*, supra, 279 Conn. 619–20 n.11. Similarly, the police officers in *Fleming could* have asked Fleming whether she resided in the apartment. See *Fleming* v. *Bridgeport*, supra, 284 Conn. 534–35. Nonetheless, we did not require that the government officials in either case engage in further inquiry beyond the information available to them at the time of their discretionary acts or omissions. Just as the supervisor in *Doe* "never became aware" of the assault, Vece never became aware that Vincent was driving at an excessive rate of speed or improperly using his blue courtesy lights, and, therefore, "it could not have been apparent to [Vece]" that her response to Vincent or lack thereof likely would have subjected the occupants of the Infiniti, including Hopkins, to imminent harm.[20] *Doe* v. *Petersen*, supra, 620.

The plaintiff argues that we should consider more than just the audio recording and transcript of the 911 call in evaluating whether the apparentness requirement was satisfied because Vece's knowledge went beyond what she heard during her conversation with Vincent. Vece's knowledge, the plaintiff contends, includes the geography and layout of the town roads. The plaintiff further claims that this knowledge of the town's geography would have made it apparent to Vece that Cardillo was making a lot of turns with the Infiniti and, therefore, that a dangerous pursuit was occurring. Vece's knowledge of the roads, in and of itself, is not probative, however. Although Vece may have known that the roads were winding and unilluminated, the speed limit was put in place to foster a safe mode of travel and, thus, Vece would have had little cause for concern if Vincent and Cardillo had been driving at or below the speed limit.[21]

Similarly, the plaintiff contends that the risk of harm to Hopkins was apparent to Vece because she knew the location of the vehicles at various points of the pursuit and therefore would have been able to determine that the drivers were speeding by comparing the

elapsed time during the 911 call to the progress of the vehicles during the pursuit.[22] This is precisely the type of analysis that the court rejected in *Doe*. Although the supervisor in *Doe* knew that the instructor had offered Doe a ride in the instructor's car but had not taken her home, because the supervisor "never became aware of the alleged assault, it could not have been apparent to [the supervisor] that his response to [Doe's] concerns would have been likely to subject her to a risk of harm." Id. Similarly, although Vece knew the location of the vehicles at various points, she never became aware that a dangerous pursuit was occurring, and, therefore, the risk of harm to Hopkins could not have been apparent to her. Furthermore, to require Vece to analyze the route that Vincent and Cardillo were taking and to calculate how much time it would have taken them to travel from one point on that route to another while obeying the speed limit would place a significant burden on her duties as a 911 dispatcher, which include assessing information as quickly as possible and relaying that information to responding emergency personnel.

Although we agree that a court may consider a government official's position and accompanying background knowledge, Vece's knowledge regarding the inherent dangers of vehicular pursuits also is not outcome determinative. If Vincent was indeed engaging in a "pursuit," as defined by the legislature in the context of police chases,[23] Vece could not have become aware of this fact from their conversation during the 911 call. The legislature has defined a police "pursuit" as "an attempt by a police officer in an authorized emergency vehicle to *apprehend any occupant of another moving motor vehicle*, when the driver of the fleeing vehicle is *attempting to avoid apprehension* by *maintaining or increasing the speed of such vehicle* or by ignoring the police officer's attempt to stop such vehicle." (Emphasis added.) General Statutes § 14-283a (a). Importantly, the object of a pursuit is to apprehend the subject. Vincent did not indicate to Vece during their conversation that he was attempting to apprehend the driver of the Infiniti. Rather, the audio recording and transcript of the 911 call reveal that Vincent merely was attempting to keep the Infiniti in sight in order to identify details regarding the vehicle, including the model name, color and license plate number, and to report its location.[24] Although flashing blue courtesy lights, high speed, and tailgating might have indicated to the occupants of the Infiniti that Vincent was pursuing them, Vece was not aware of these facts, and, thus, it could not have been apparent to her that a dangerous vehicular pursuit was in progress.

The plaintiff also claims that Vece's acknowledgment that there was no further value to Vincent in keeping the Infiniti in sight indicates that the apparentness requirement has been satisfied because it was apparent to Vece that there was no need for the pursuit to con-

tinue. This argument fundamentally misconstrues the apparentness requirement. Our inquiry is not whether it is apparent to the government official that an action is useful, optimal, or even adequate. Rather, we determine whether it would have been apparent to the government official that her actions likely would have subjected an identifiable person to imminent harm. See, e.g., *Doe* v. *Petersen*, supra, 279 Conn. 620. Although it might have been apparent to Vece that Vincent's actions served no further purpose, it does not follow that she was or should have been aware that her acts or omissions likely would have subjected Hopkins to imminent harm.

Finally, the plaintiff argues that we should be guided by our decisions in *Purzycki* v. *Fairfield*, supra, 244 Conn. 101, and *Sestito* v. *Groton*, 178 Conn. 520, 423 A.2d 165 (1979). Neither of these cases is controlling. The sole issue in *Purzycki* was whether the plaintiffs had proven that a child was "subject to imminent harm"; *Purzycki* v. *Fairfield*, supra, 103; and this court thus did not fully address the apparentness requirement.[25] See *Doe* v. *Petersen*, supra, 279 Conn. 618 ("[w]e relied heavily on the 'imminency' requirement to reach our conclusion in *Purzycki*"). In addition, we decided *Sestito* before we adopted the three-pronged imminent harm test and have found that its holding is limited to its facts. *Grady* v. *Somers*, 294 Conn. 324, 353, 984 A.2d 684 (2009); see also *Shore* v. *Stonington*, 187 Conn. 147, 153–54, 444 A.2d 1379 (1982).[26]

The judgment is reversed only with respect to the town and the case is remanded with direction to render judgment for the town; the judgment is affirmed in all other respects.

In this opinion ROGERS, C. J., and PALMER, McDONALD and ESPINOSA, Js., concurred.

[1] The Clinton Volunteer Fire Department, Matthew Vincent and William Cardillo also were named as defendants in the present action. The action was withdrawn as against Vincent and Cardillo. See footnote 3 of this opinion. The town is the only defendant participating in this appeal.

[2] The amended complaint, which was filed by the substitute plaintiff, Adele P. Edgerton, successor conservator of Hopkins' estate (plaintiff), alleged, inter alia, that Vece, as a 911 dispatcher, was an employee and agent of the town and was acting within the scope of her employment when responding to Vincent's call. The plaintiff thus contended that the town should be liable for Hopkins' injuries because Vece "explicitly and/or impliedly encourag[ed], authorize[ed], permitt[ed] and fail[ed] to deter or prohibit Vincent [from] track[ing], follow[ing], pursu[ing], or otherwise engag[ing] the Infiniti, and was utilizing Vincent as an agent of the [t]own . . . to track, follow, pursue, or otherwise engage the Infiniti." According to the plaintiff, Vece allegedly deputized Vincent by failing to instruct him not to follow and pursue the Infiniti.

[3] Walker Hopkins was severely injured in the collision. Catharine Hopkins, the conservatrix of Walker Hopkins' estate, filed an action on Walker Hopkins' behalf against the town, the Clinton Volunteer Fire Department (fire department), Vincent, and Cardillo. Catharine Hopkins claimed that the town was liable due to the negligent acts or omissions of Vece and Vincent, both of whom allegedly were acting in their capacity as government officials at the time of the accident. Catharine Hopkins further claimed that the fire department was liable because Vincent allegedly was acting, at all relevant times, within the scope of his duties as a volunteer firefighter. Edgerton subsequently was substituted as the plaintiff. Hereinafter, we refer to Walker Hopkins as Hopkins.

The action later was withdrawn as to Vincent. Although the action also was withdrawn as to Cardillo, the town and the fire department filed an apportionment complaint against Cardillo, which also was subsequently withdrawn. The fire department remains as a defendant but has not actively participated in this appeal. See footnote 1 of this opinion.

[4] General Statutes § 52-557n (a) (1) provides in relevant part: "Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . ."

[5] The jury attributed 5 percent of the negligence to Vincent and the remaining 5 percent to Cardillo.

[6] Jacqueline Denise Douglas also was a passenger in the Infiniti.

[7] The transcript of the 911 call, which commenced at approximately 9:20 p.m. on August 5, 2005, provides in relevant part:

"[9:20:14 Vece]: Is this an emergency?

"[9:20:15 Vincent]: Yes, it is. I just got hit by a motor vehicle, and he just took off and I'm trying to catch up to him to get his plate.

"[9:20:20 Vece]: Where are you?

"[9:20:21 Vincent]: I'm on Liberty Street.

\* \* \*

"[9:20:31 Vincent]: I'm going toward the bridge. He's now gonna turn onto Ferry Dell Road.

\* \* \*

"[9:20:39 Vincent]: This is Matt Vincent. He's got front end damage, he's not stopping—

"[9:20:47 Vece]: Did you get a plate?

"[9:20:48 Vincent]: Yup. 280TVD, I think.

\* \* \*

"[9:21:03 Vincent]: We're going up to the Jared Eliot [Middle] School.

\* \* \*

"[9:22:57 Vincent]: 280TVD—we're coming out onto, uh, what's the name of the road, Brickyard?

"[9:23:06 Vece]: Okay.

"[9:23:06 Vincent]: We're off Brickyard. We're coming up onto Brickyard.

"[9:23:12 Vece to Police Officers]: All units, the hit-and-run vehicle, the person that he hit is following, it is going onto Brickyard.

"[9:23:18 Vincent]: We're going down toward Glenwood.

"[9:23:19 Vece to Police Officers]: They're going down towards Glenwood.

"[9:23:26 Vece]: What color's the vehicle?

"[9:23:28 Vincent]: It's brown. It's a brown Infiniti I30, 280TVD.

"[9:23:32 Vece]: Okay.

"[9:23:35 Vincent]: We're just coming up on Ironworks.

\* \* \*

"[9:23:41 Vincent]: Turning onto Ironworks. Turning onto Ironworks.

\* \* \*

"[9:23:53 Vece]: [On] [w]hat road did he hit you, Matt?

"[9:23:55 Vincent]: What?

"[9:23:57 Vece]: [On] [w]hat road did he hit you?

"[9:23:59 Vincent]: He hit me right at the intersection of the commuter lot.

"[9:24:01 Vece]: Okay.

"[9:24:07 Vincent]: And he [has] just taken off, and he's going at a high rate of speed.

"[9:24:11 Vece]: Up Ironworks?

"[9:24:12 Vincent]: Up Ironworks.

"[9:24:15 Vece to Police Officers]: All responding units, the vehicle [has] now taken off. He's going a high rate of speed up Ironworks. I'll notify the troop.

"[9:24:23 Vincent]: You know, I don't know how fast I want to try to catch up to him.

"[9:24:27 Vece]: Matt, we know who it is. We know who it is, Matt. Hold on, I'm gonna call Troop F and see if we can get another officer up at the other end of Ironworks, okay?

"[9:24:33 Vincent]: Oh, he just wrecked it. He just wrecked it.

"[9:24:36 Vece]: Wait a minute. Where?

"[9:24:36 Vincent]: He just—holy shit—he just rolled the car. He just rolled the car.

"[9:24:39 Vece]: Alright. Whereabouts?

"[9:24:41 Vincent]: Right on Ironworks.

"[9:24:42 Vece to Police Officers]: All units, head up to Ironworks . . . . [T]his person just rolled the vehicle. I'm trying to get more information.

"[9:24:47 Vincent]: You better get a frickin' ambulance up here. The car is on fire.

"[9:24:51 Vece]: Okay.

"[9:24:52 Vincent]: I'm gonna get out, and I'm gonna try and hit the fire.

"[9:24:53 Vece to Police Officers]: Okay. All units, be advised the vehicle is fully involved, okay."

[8] The town also claimed that the plaintiff failed to state a claim on which relief could be granted and that Hopkins' injuries were due to his own negligence and carelessness in that he operated or allowed the Infiniti to be operated under the influence of alcohol or drugs, failed to keep a proper lookout, failed to act as a reasonably prudent person would act under the circumstances, evaded responsibility after colliding with Vincent's vehicle, and failed to keep his vehicle under proper control.

[9] Unlike sovereign immunity, which includes immunity from suit and immunity from liability, governmental immunity shields a municipality from liability only. See, e.g., *Vejseli* v. *Pasha*, 282 Conn. 561, 572–74, 923 A.2d 688 (2007). Immunity from suit on the basis of sovereign immunity implicates subject matter jurisdiction, and, therefore, sovereign immunity issues are resolved prior to trial. See id., 571–72; *Manifold* v. *Ragaglia*, 94 Conn. App. 103, 122, 891 A.2d 106 (2006). In contrast, because governmental immunity shields a governmental entity from liability rather than litigation to which it does not consent, unresolved factual issues concerning a governmental immunity claim can be decided by a jury. See *Vejseli* v. *Pasha*, supra, 572–74.

[10] In the present case, there are no unresolved factual issues regarding apparentness because all of the relevant facts were captured in the audio recording of the 911 call or are otherwise undisputed. The dissenting justice asserts that there is a material issue of fact regarding whether Vece acted as a reasonable dispatcher would under the circumstances, citing to the competing testimony from the plaintiff's expert and the town's expert about the standard of care. The dissenting justice contends that, if the jury accepted the plaintiff's expert's testimony, the standard of care would render it "apparent to a reasonable dispatcher in Vece's position that failing to order Vincent to cease his pursuit, in and of itself, created [a risk of] imminent . . . harm to an identifiable person . . . ." We disagree. Imposing liability when a municipal officer deviated from an ordinary negligence standard of care would render a municipality's liability under § 52-557n no different from what it would be under ordinary negligence. This would run counter to the purpose of governmental immunity, which is to protect a municipality from liability arising from a municipal officer's negligent, discretionary acts unless the officer's duty to act is clear and unequivocal. See, e.g., *Doe* v. *Petersen*, 279 Conn. 607, 615, 903 A.2d 191 (2006); cf. General Statutes § 52-557n (a) (2) ("[e]xcept as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by . . . [B] negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law"). This policy is especially relevant in cases such as the present one, in which the government officer is called on to make split second, discretionary decisions on the basis of limited information. See *Durrant* v. *Board of Education*, 284 Conn. 91, 106, 931 A.2d 859 (2007) ("[d]iscretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury" [internal quotation marks omitted]).

Therefore, unlike under an ordinary negligence standard of care, under the apparentness requirement of the identifiable person-imminent harm exception, there is no inquiry into the ideal course of action for the government officer under the circumstances. Rather, the apparentness requirement contemplates an examination of the circumstances of which the government officer could be aware, thereby ensuring that liability is not imposed solely on the basis of hindsight, and calls for a determination of whether those circumstances would have revealed a likelihood of imminent harm to an identifiable person.

Finally, we note that the plaintiff's expert in emergency communications, Nancy Dzoba, acknowledged in her testimony the distinction between what a reasonable dispatcher would do and what would be apparent to a reasonable officer. Specifically, the town's attorney asked Dzoba: "[A]nd someone with [the] information [available to Vece] wouldn't be able to say at any time during this route that the Hopkins driver is at imminent risk of harm, meaning about to happen, am I correct?" Dzoba replied: "That's correct, I think." Thus, Dzoba acknowledges that, even if a reasonable dispatcher would have told Vincent to cease his pursuit, that does not necessarily mean that it would be apparent to a reasonable dispatcher that not doing so would have put Hopkins at risk of imminent harm.

[11] See footnote 4 of this opinion for the text of § 52-557n (a) (1) (A).

[12] This section codified the common-law distinction between discretionary and ministerial acts. See *Grady* v. *Somers*, 294 Conn. 324, 347–48, 984 A.2d 684 (2009).

[13] This court determined in *Grady* v. *Somers*, 294 Conn. 324, 984 A.2d 684 (2009), that the identifiable person-imminent harm exception applies in actions brought pursuant to § 52-557n. See id., 348–49.

We take this opportunity to clarify the relationship between the public versus private duty distinction and the identifiable person-imminent harm

exception to governmental immunity. Under § 52-557n (a) (1), "a political subdivision of the state shall be liable for damages to person or property caused by: (A) The *negligent acts or omissions* of such political subdivision or any employee . . . acting within the scope of his employment or official duties . . . ." (Emphasis added.) This negligent act or omission must arise from the breach of a private duty on the part of the officer or municipality. See *Shore* v. *Stonington*, 187 Conn. 147, 152, 444 A.2d 1379 (1982). The court in *Shore* stated that a private duty may be established when, for example, it would be apparent to a municipal official that his failure to act likely would subject an identifiable person to imminent harm. Id., 153. Therefore, if the plaintiff satisfies the identifiable person-imminent harm test, the plaintiff has proven that the municipality or its officers owed a private duty to the plaintiff. See id., 152–53. Conversely, if the plaintiff fails to satisfy the identifiable person-imminent harm test and does not establish a private duty through other means, the plaintiff cannot succeed in bringing a negligence action against a municipal officer or municipality under § 52-557n on the basis of the municipal officer's discretionary act or omission. Thus, we now clarify that the identifiable person-imminent harm exception is one of the ways in which a plaintiff may establish that, despite the discretionary nature of the officer's acts or omissions, the officer's duty to act was clear and unequivocal so as to warrant imposing liability on the municipality.

[14] We recognize that we have described the apparentness requirement as "would have made it apparent." We take this opportunity to clarify that the test is an objective one. We do not ask whether the government agent actually knew that harm was imminent but, rather, whether the circumstances would have made it apparent to a reasonable government agent that harm was imminent.

[15] The dissenting justice suggests that this court's jurisprudence would "[encourage] municipalities to engage in wilful blindness to dangers that might be prevented through the institution of better training programs." First, a strict adherence to what a reasonable municipal officer would know under the circumstances is the best way to ensure that wilful blindness does *not* occur. If the circumstances are such that the imminent harm would be apparent, then, of course, governmental immunity would not apply regardless of the wilful blindness of the officer. In addition, not imposing liability for dangers of which the officer could not be aware protects important government functions, as it shields officers from hindsight bias, second-guessing and retaliatory lawsuits. See *Doe* v. *Petersen*, supra, 279 Conn. 615.

[16] We further stated that this allegation was "unsupported by the record . . . ." *Doe* v. *Petersen*, supra, 279 Conn. 619 n.11.

[17] It was the *plaintiff's* expert in emergency communications who acknowledged that Vincent did not "sound excited" and that "his voice . . . sound[ed] very level and steady" in the audio recording. The plaintiff's expert also testified that, from listening to the audio recording, she "could not tell how fast the cars were traveling . . . ." The plaintiff's expert further acknowledged that Vece "heard nothing about [the Infiniti] being [driven] erratic[ally] in any way until . . . Vincent said, and they've taken off at a high rate of speed while on Ironworks [Road] . . . ."

[18] Vece did know that the Infiniti was traveling at a "high rate of speed" approximately twenty-four seconds prior to the accident. Nevertheless, the Infiniti's high rate of speed—in the absence of speeding on the part of Vincent—would not have made it apparent to Vece that her acts or omissions might cause any imminent harm. Vece had no contact with, and therefore no control over, the occupants of the Infiniti. Thus, her acts or omissions could have affected the Infiniti only insofar as she gave instructions to Vincent, Vincent followed those instructions, and Cardillo reacted in response.

The only point at which Vincent mentioned his own speed was approximately ten seconds before the collision, when he stated: "I don't know how fast I want [to go] to try to catch up to him." This statement, if anything, would indicate to a reasonable dispatcher that Vincent was *not* driving at an excessive rate of speed at the time and was merely considering such an action. Moreover, Vece responded to Vincent's statement by assuring him that the police knew who the driver was, thus indicating to Vincent that there was no need for him to engage in a pursuit. There was no additional time for Vece to clarify further, as she testified that "when [she] told him that [the police] knew who it was and [she] finished that sentence, [the Infiniti] had wrecked." The audio recording and transcript of the 911 call

support this statement, as there were only a few seconds in between Vincent's statement that he did not know how fast he wanted to go to try to catch up, Vece's response, and Vincent's report that the Infiniti had crashed.

[19] In fact, Vece testified that she "didn't know that [Vincent] was on the fire department" and, therefore, had no way of knowing that his vehicle was equipped with blue courtesy lights, let alone that he was using them.

[20] In addition, we note that, unlike the supervisor in *Doe*, Vece did not affirmatively hinder Vincent from informing her of potentially dangerous conditions relating to Vincent's pursuit of the Infiniti. Therefore, the facts of the present case provide an even stronger basis on which to afford governmental immunity than the court had in *Doe*.

[21] The dissenting justice states that our "conclusion that the risk would not be apparent to a reasonable dispatcher in Vece's position seems to be based on [our] understanding that Vincent's pursuit of the [Infiniti] would have created a risk of imminent harm *only* if the vehicles were traveling at a high rate of speed." (Emphasis in original.) Although the speed of the vehicles is not determinative of whether there is a pursuit or chase, knowledge of high speeds, or lack thereof, is certainly relevant to the apparentness requirement. It certainly could not be apparent to Vece, who had no knowledge that Vincent was speeding, tailgating, or engaging his blue courtesy lights, that Cardillo would drive erratically as a result of Vincent's actions.

[22] Specifically, the plaintiff demonstrated that, if both Vincent and Cardillo had been driving at or below the speed limit, the drive should have taken nearly five minutes but, in fact, took three minutes and ten seconds.

[23] The town has no written policy regarding hit-and-run accidents, and, thus, we draw our conclusions on the basis of the definition of "pursuit" in this parallel context.

[24] The plaintiff claims that Vincent's statement that "he's not stopping" should have alerted Vece to the fact that there was a pursuit. The plaintiff takes this statement out of context. Vincent informs Vece approximately three seconds into the 911 call that he was the victim of a hit-and-run collision. He then conveys more information to Vece, including "[h]e's got front end damage, he's not stopping," an identification of the license plate number, the make and model of the vehicle, and the location of the vehicle at various points of the route. When a collision occurs, normally, the driver of the offending vehicle will stop and communicate with the driver of the other vehicle involved. It would be reasonable for a dispatcher to believe that Vincent merely was imparting another piece of information about the behavior of the driver of the Infiniti.

[25] Although the court in *Purzycki* did briefly mention the apparentness requirement; *Purzycki* v. *Fairfield*, supra, 244 Conn. 108; the issue on appeal was not apparentness but, rather, the imminent harm prong of the identifiable person-imminent harm test. See id., 108–11. The parties did not raise the apparentness issue. See id. Furthermore, both *Purzycki* and another related decision, namely, *Burns* v. *Board of Education*, 228 Conn. 640, 638 A.2d 1 (1994), are distinguishable from the present case because they involved school principals or superintendents who had a special duty of care regarding children in their respective school districts. See *Purzycki* v. *Fairfield*, supra, 103 n.1, 108; *Burns* v. *Board of Education*, supra, 648.

The dissenting justice contends that "the fact that a municipal official might owe a higher duty to schoolchildren while [they are] on school property than another municipal official would owe to other persons under other circumstances has little bearing on an analysis of whether a threat of imminent harm to an identifiable person would be *apparent* to a municipal official . . . in any setting." (Emphasis in original.) We first observe that this statement seems contrary to the dissenting justice's position that the standard of care for a reasonable dispatcher is relevant to the apparentness analysis in the present case. In addition, we note that the special duties in *Burns* and *Purzycki*, unlike any duty that Vece may have owed to Hopkins in the present case, arose from the fact that school principals and superintendents are charged with the responsibility of caring for schoolchildren. Of course, circumstances that would not otherwise create an apparent danger for an adult, such as a lack of supervision, nevertheless could create a likely risk of imminent harm for children.

For instance, in *Purzycki*, an eight year old elementary school child was tripped by another child and sustained injuries while the child was running through the school hallway unsupervised. *Purzycki* v. *Fairfield*, supra, 244 Conn. 104. The issue on appeal was whether the child was subject to "imminent harm . . . ." Id., 106. Unlike in the present case, the apparentness requirement was not at issue in *Purzycki* because the school principal admitted (1) to his awareness that the schoolchildren were not supervised during the window of time at issue, and (2) that the schoolchildren tend to

"run" and "engage in horseplay," often resulting in injuries when they were left unsupervised. *Purzycki* v. *Fairfield*, 44 Conn. App. 359, 367, 689 A.2d 504 (1997) (*Heiman, J.*, dissenting), rev'd, 244 Conn. 101, 708 A.2d 937 (1998).

Similarly, in *Burns*, a high school student slipped and fell on ice while walking through a school courtyard on the way to his guidance counselor's office, thereby sustaining injuries. *Burns* v. *Board of Education*, supra, 228 Conn. 642. In concluding that the city of Stamford and the superintendent of schools were not shielded from liability by governmental immunity, the court concluded that, "[a]s a matter of policy . . . our case law . . . has traditionally recognized that children require special consideration when dangerous conditions are involved." Id., 650; see also *Durrant* v. *Board of Education*, 284 Conn. 91, 120, 931 A.2d 859 (2007) (*Norcott, J.*, dissenting) ("[t]he ringing of the . . . bell at the end of the school day does not magically bestow a young child with maturity and sound judgment, and does not, therefore, deprive that child of the 'special considerations' to which he is entitled under the law").

In sum, because *Burns* and *Purzycki* do not specifically address the apparentness requirement and there were special considerations in each case, we are guided instead by our more recent precedent in *Doe* and *Fleming*, both of which outline the apparentness requirement in more detail.

[26] Because we conclude that the identifiable person-imminent harm exception does not apply in the present case, we decline to address the second issue, namely, whether Vece's failure to act was a proximate cause of Hopkins' injuries.