******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., dissenting. I respectfully dissent. In my opinion, the circumstances in the present case should have made it apparent to a reasonable 911 dispatcher in the position of Ellen Vece, the dispatcher employed by the named defendant, the town of Clinton (town),[1] that failing to order the defendant Matthew Vincent[2] to cease his pursuit of the car containing the plaintiff's conserved person, Walker Hopkins, would create a risk of imminent harm to an identifiable person.[3]

Unless noted otherwise, I accept the statement of facts set forth in the majority opinion. There is, therefore, no need to repeat those facts here. I respectfully disagree, however, with the majority's position that our earlier cases addressing the liability of school officials, namely *Burns* v. *Board of Education*, 228 Conn. 640, 638 A.2d 1 (1994), and *Purzycki* v. *Fairfield*, 244 Conn. 101, 708 A.2d 937 (1998), should be dismissed when analyzing the meaning of the "apparentness" prong of the identifiable person-imminent harm exception because "they involved school principals or superintendents who had a special duty of care regarding children in their respective school districts." See footnote 25 of the majority opinion. In my view, the fact that a municipal official might owe a higher duty to schoolchildren while on school property than another municipal official would owe to other persons under other circumstances has little bearing on an analysis of whether a threat of imminent harm to an identifiable person would be *apparent* to a municipal official, in any setting.

As a preliminary matter, I respectfully disagree with the majority's understanding of the interplay between the negligence of a municipal employee and the liability of a municipality as codified by General Statutes § 52-557n, or as the majority describes it: "between the public versus private duty distinction and the identifiable person-imminent harm exception to governmental immunity." See footnote 13 of the majority opinion. The majority, relying on this court's decision in *Shore* v. *Stonington*, 187 Conn. 147, 444 A.2d 1379 (1982), states that, when engaging in actions that involve the exercise of discretion, a municipal employee cannot be found to owe a duty to an individual plaintiff *unless* one of the three exceptions to discretionary act immunity apply. I do not agree with this interpretation of the workings of § 52-557n,[4] as the language of the statute itself implies that a determination that the municipal employee was actually negligent necessarily precedes the application of governmental immunity. As currently worded, § 52-557n (a) (2) provides in relevant part: "Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property

caused by . . . (B) *negligent* acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." (Emphasis added.) Thus, the plain language of this subsection assumes that this exception to the general rule of municipal liability,[5] will operate as a defense to liability, and apply after the municipal employee's actions have been found negligent. In other words, my understanding of the proper procedure for dealing with municipal liability is as follows: (1) the plaintiff must prove that the municipal employee acted negligently, in such a way as to cause injury to the plaintiff; see, e.g., *Considine* v. *Waterbury*, 279 Conn. 830, 880, 905 A.2d 70 (2006) ("[a] prima facie case of negligence consists of four elements: duty; breach; causation; and injury"); (2) the municipality must then demonstrate that the municipal employee's action occurred during an activity which requires the exercise of discretion by the employee; see, e.g., *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 24, 664 A.2d 719 (1995) ("We have previously determined that governmental immunity must be raised as a special defense . . . . Governmental immunity is essentially a defense of confession and avoidance similar to other defenses [that must] be affirmatively pleaded . . . ." [Citation omitted.]); (3) if necessary, the plaintiff must then show that one of the exceptions to governmental immunity, such as the identifiable person-imminent harm exception, applies for liability to attach. See, e.g., *Grady* v. *Somers*, 294 Conn. 324, 335–37, 984 A.2d 684 (2009). Thus, the identifiable person-imminent harm exception is not used to determine whether the municipal agent owed the plaintiff a duty in the first place— this initial determination will already be made when determining whether the municipal defendant was negligent. Instead, the identifiable person-imminent harm exception serves as a mechanism that courts use to sift and separate those cases in which a negligent municipal employee's duty to act was so clear and unequivocal that his or her failure to do so warrants a departure from the general rule that municipal employees are immune from liability under such circumstances.[6] This approach would thus balance society's competing interests in (1) ensuring that our municipal officials are not overly exposed to liability for split second decisions that require the exercise of judgment, and (2) preserving for the individual plaintiff the ability to hold a municipality responsible when one of its agents fails to act when it is apparent to the agent that, as a result, an identifiable person will be subjected to imminent harm.

Although I agree with the majority that, ultimately, the determination of whether the identifiable person-imminent harm exception to the doctrine of qualified immunity is a matter of law; see, e.g., *Purzycki* v. *Fairfield*, supra, 244 Conn. 107–108; this court must make this determination in light of the factual findings of the

jury. In the present case, the jury made an explicit factual finding related to the issue of "apparentness." In my opinion, the two parties disagreed as to whether it would be apparent to a reasonable dispatcher in Vece's position that failing to order Vincent to cease his pursuit, in and of itself, created an imminent risk of harm to an identifiable person, namely, the occupants of the car being followed by Vincent. Both parties presented evidence in the form of expert witnesses on this point. The defense expert opined that such a risk would not be apparent to a reasonable dispatcher, noting that Vece followed the written directives set forth by the town and utilized discretion in dealing with this emergency. The plaintiff's expert, on the other hand, opined that Vece did not act as a reasonable dispatcher would have because there are inherent dangers associated with allowing the victim of a hit and run to follow the offending vehicle that would have been apparent to a reasonable dispatcher. The answers to the jury interrogatories indicate that the jury credited the plaintiff's expert and, in doing so, made a factual finding that it would have been apparent to a reasonable dispatcher in Vece's position that failing to cease Vincent's pursuit would create an imminent risk of harm. In my opinion, this court should consider all of the facts found by the jury and make all reasonable inferences from them in the light most favorable to sustaining its verdict. See, e.g., *Craine* v. *Trinity College*, 259 Conn. 625, 635, 791 A.2d 518 (2002).

Turning to the substance of the majority's opinion, I disagree with its analysis pursuant to the current formulation of the identifiable person-imminent harm exception enunciated by this court in *Doe* v. *Petersen*, 279 Conn. 607, 618 and n.10, 903 A.2d 191 (2006). In that case, this court set forth, for the first time, three distinct prongs that must be satisfied before the exception applies.[7] These prongs are: "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to harm." Id. On appeal, the town does not dispute the jury's findings that (1) Vece had a duty to prevent imminent harm from occurring to Hopkins, (2) Vece breached that duty, and (3) that Hopkins was an identifiable person for purposes of whether the identifiable person-imminent harm exception to discretionary act immunity applies. Thus, the applicability of the exception turns on whether, under the circumstances, it would have been apparent to a reasonable dispatcher in Vece's position that failing to act would expose Hopkins to imminent harm.[8]

The majority concludes that the information conveyed to Vece during Vincent's telephone call would not have made any risk of imminent harm apparent to a reasonable dispatcher. In doing so, the majority discounts the circumstances that, in my opinion, would have made it apparent to a reasonable dispatcher in

Vece's position that, if the dispatcher did not tell Vincent to pull over, a risk of imminent harm would be created to one or more identifiable persons, including Hopkins. In my view, the dialogue between Vece and Vincent, considered in light of the testimony of Nancy Dzoba, the plaintiff's expert witness, would have provided a reasonable dispatcher in Vece's position with sufficient information to make apparent the imminent risk of harm created by allowing the pursuit to continue.

Dzoba had more than twenty years of combined experience as an emergency dispatcher and as a supervisor of emergency dispatchers. The plaintiff offered her testimony as proof of the standard of care owed by a reasonable dispatcher under the circumstances presented by this case, and to prove that the risks of allowing Vincent to proceed with his pursuit of the vehicle that hit him would have been apparent to a reasonable dispatcher.[9] First, Dzoba outlined the general duty that dispatchers owe to the public when dealing with an emergency: "You always want to make sure that . . . no citizen becomes a victim. . . . They're not trained to subdue a culprit or to subdue a suspect. So you don't want to put somebody in that situation." Asked if anything "jump[ed] out" to her regarding this particular emergency call, Dzoba noted that "as [Vece] heard . . . the person had left the scene . . . the [caller has] already . . . been a victim of a crime because [he was] a victim of a hit and run. So you don't want [him] to be a victim a second time because if [he] pursue[s] or chase[s] [the] . . . other vehicle . . . you don't know if you're going to end up with a case of road rage or if you're going to be chasing somebody and then [if] the people you're chasing don't know who you are, they drive erratically . . . ." The plaintiff's attorney then asked, "[i]n the case of a hit and run where somebody says, I'm going to catch up and get their plate, who are the people who are in imminent risk of getting hurt if the dispatcher doesn't say, pull over civilian and get to a safe place, the police are taking care of this?" Dzoba replied: "The original concern would be the victim of the hit and run themselves, because . . . you don't know who's in that car, why did they flee the scene. . . . If he's chasing that other person that was the culprit in the hit and run . . . the suspect doesn't know why this person is behind [him] or may know but doesn't want to stop. So [the suspect] may drive erratically to get away from [him]. So there could be a chance that either they're going to have an accident and get injured or they're going to injure somebody else . . . ." Thus, in Dzoba's opinion, the words used by Vincent to convey his intended behavior to Vece at the very outset of the telephone call would have alerted a reasonable dispatcher to an imminent risk that a further accident could occur involving the pursued vehicle, causing injury to those within it.

The majority opinion focuses on Dzoba's agreement

with the defense counsel that there were no audible cues that would indicate that either car was driving erratically or at a high rate of speed. In my opinion, this approach takes too narrow a view of what might be considered "circumstances" that would alert a reasonable dispatcher to the imminent risk of harm that was created when Vincent decided to leave the scene of the accident and pursue the car that hit him. Although Dzoba noted that she could not be certain, from the tape alone, that Vece's breach of duty placed any identifiable person at risk of imminent harm at any specific moment in time during the chase. The tape contained a statement, one second into the call, that would have made the situation clear to a reasonable dispatcher. The content of the tape cannot be considered in a vacuum. Doing so would ignore the specialized training received by dispatchers that distinguishes them from members of the general public.[10] Dzoba testified that none of the national organizations that provide training to dispatchers anticipate that a dispatcher will allow the victim of a hit and run to pursue a fleeing vehicle. Dzoba explained that "the assumption is . . . if you're a victim of a hit and run, you're going to stay at the scene and make the report. . . . Like [I] said it's a standard of care if we knew somebody was leaving the scene we would tell them to go back and wait for an officer. We would ask [initial] questions and as you heard in the beginning of the tape [Vece] didn't ask the questions . . . was anybody hurt, where did the accident occur. It wasn't . . . until later in the call . . . she got some of that information, but those questions that were on there were not asked during the call, the majority of them weren't. . . . The assumption is that [the dispatcher is] going to have the person stay at the scene and make the police report." Thus, Dzoba was unequivocal that, when a dispatcher fails to require the victim of a hit and run to remain at the scene and, instead, allows or encourages the victim to pursue the offender, a risk of imminent harm is created.

Indeed, an examination of Vece's own testimony demonstrates that the mere fact of pursuit would have made this risk apparent to a reasonable dispatcher in her position. Vece testified that "[t]he act [of chasing] could cause more accidents or antagonize whoever he's chasing." Vece also admitted that "it's not appropriate to chase somebody," but claimed that she believed that Vincent was "just keeping [the car] in sight" and was not aware that he was not going the speed limit.

The majority's conclusion that the risk would not be apparent to a reasonable dispatcher in Vece's position seems to be based on its understanding that Vincent's pursuit of the vehicle that hit him would have created a risk of imminent harm *only* if the vehicles were traveling at a high rate of speed. I disagree. Although Vece's own subjective belief was that no risk of imminent harm could result from the pursuit so long as Vincent did not

exceed the speed limit, that belief is directly contradicted by Dzoba's testimony. Indeed, Dzoba's testimony clearly indicates that, by allowing the victim of a hit and run to follow the offending vehicle, a dispatcher creates a risk that the driver of the offending vehicle may be antagonized or start driving erratically at any moment. These dangers are not dependent on speed. On cross-examination, Dzoba specifically testified that neither the speed of cars involved, nor the conditions of the roads on which they were traveling, were relevant to the formulation of her opinions. Thus, the jury reasonably could have concluded that, in the present case, hearing the words, "I just got hit by a motor vehicle . . . he just took off and I'm trying to catch up to him to get his plate," words which Vincent said approximately one second into his telephone call with Vece, would have made it apparent to a reasonable dispatcher in Vece's position that her failure to keep Vincent at the scene of the accident created a risk of imminent harm to Vincent and the occupants of the pursued vehicle.

I also respectfully disagree with the majority's conclusion that Vece had no time to react after she first had notice that the cars were traveling at a high rate of speed. Twenty-six seconds before the accident occurred, Vincent reported to Vece that the car that hit him had "just taken off and he's going at a high rate of speed." Given Dzoba's testimony that a reasonable dispatcher is aware that chases can cause erratic driving, it should have been apparent that the vehicle containing Hopkins was reacting to being followed. It would be reasonable for a jury to infer that, had Vece immediately told Vincent to cease his pursuit, the car containing Hopkins would not have continued at the same high rate of speed because the driver would no longer feel a need to attempt to escape Vincent.

The majority asserts that this case, more clearly than *Doe*, reflects a set of circumstances in which the identifiable person-imminent harm exception does not apply. I would come to the opposite conclusion. In my opinion, the present case, unlike other cases recently addressed by the court, including *Doe* v. *Petersen*, supra, 279 Conn. 607, and *Fleming* v. *Bridgeport*, 284 Conn. 502, 935 A.2d 126 (2007), presents a set of circumstances that strongly warrants the application of the identifiable person-imminent harm exception to qualified immunity. In *Doe* and *Fleming*, the officials were not provided with all of the information that a reasonable official in their positions would have needed in order for it to be apparent that their actions would pose an imminent risk of harm to an identifiable person. See *Doe* v. *Petersen*, supra, 620 ("[b]ecause [the official] never became aware of the alleged assault, it could not have been apparent to him that his response to the plaintiff's concerns would have been likely to subject her to a risk of harm"); *Fleming* v. *Bridgeport*, supra, 534–35 ("[T]he

plaintiff did not inform the officers of, and no other source made clear, the most critical piece of information that would have made it apparent that the plaintiff would have been subject to the alleged imminent harm: that [the plaintiff] was an occupant with no other place of residence. Instead, [the plaintiff's roommate] told the officers just the opposite in terms of [the plaintiff's] status as a guest."). In the present case, Vece not only had all of the information necessary to recognize the risk of imminent harm created by her inaction, but she also actively participated in creating the dangerous situation itself. For example, Vece asks Vincent approximately thirty seconds into the call, after the pursuit had begun, "[d]id you get a plate?" Nearly two minutes later, after Vece had run the license plate and reported the listed color of the vehicle to responding officers, she asked Vincent "what [color is] the vehicle?" Vece also asked Vincent to verify his location at least twice, and repeatedly reported the locations of Vincent and the chased vehicle to responding officers. By failing to order Vincent to remain at the scene and, once the pursuit was underway, effectively encouraging Vincent to continue his pursuit by requesting additional information, the jury reasonably could have inferred that Vece essentially used Vincent as an additional set of eyes and ears in an attempt to help the police quickly apprehend the fleeing vehicle.

Vece's active involvement in the creation of the risk to Hopkins creates a set of circumstances that, in my opinion, warrants the application of the identifiable person-imminent harm exception more readily than other cases in which this court has actually applied that exception. For example, in *Burns*, the superintendent of Stamford schools was denied qualified immunity based on application of the identifiable person-imminent harm exception when a student brought an action for injuries sustained when he slipped on a sheet of ice in the school's courtyard. *Burns* v. *Board of Education*, supra, 228 Conn. 649–51. In that case, the superintendent noted that "he did not visit the high school, was unaware of the icy conditions and did not instruct or encourage any student to use the courtyard on the day in question." (Internal quotation marks omitted.) Id., 643. This lack of knowledge or involvement by the superintendent was corroborated by the head custodian at the school, who indicated that "the decision of whether to salt and sand the premises was his to make and was not the superintendent's decision." (Internal quotation marks omitted.) Id. Despite this testimony, the court found that the identifiable person-imminent harm exception to qualified immunity applied to the superintendent. Id., 649–51. The court appears to have addressed the "apparentness" aspect of the analysis in that case by simply stating that "the potential for harm from a fall on ice was significant and foreseeable." Id., 650.

Likewise, in *Purzycki*, this court concluded that there was sufficient evidence from which a jury could conclude that the identifiable person-imminent harm exception applied and, by doing so, prevented a school principal and a board of education from being entitled to governmental immunity. *Purzycki* v. *Fairfield*, supra, 244 Conn. 103–104. An action was brought against the defendants in that case because a student sustained injuries when he was tripped by another student while running in an unmonitored hallway after finishing his lunch, causing the tripped student's head to go through the "wire mesh window of the exit door . . . ." (Internal quotation marks omitted.) Id., 104. In finding that the exception applied, this court must have determined that it would have been apparent to reasonable officials in the position of the principal and the board of education that their conduct created an imminent risk of harm to an identifiable person. See id., 106. Regarding this part of the analysis, this court noted that "the risk of harm was significant and foreseeable, as shown by the principal's testimony 'that if elementary schoolchildren are not supervised, they tend to run and engage in horseplay that often results in injuries.' " Id., 110. The court in *Purzycki* also noted that the school policy was to require supervision of the students during lunch and that, although the hallway itself was not monitored, "teachers in the classrooms abutting the hallway were instructed to keep their doors open in order to hear or see any activity in the hallway." (Internal quotation marks omitted.) Id., 104. The court specifically noted that the principal was never asked if, in the previous twenty-two years during which the hall monitoring policy had been in place, injuries had occurred to children while in the hallway on their way to recess. Id., 111 n.7.

The majority distinguishes *Burns* and *Purzycki* from the present case because, as it observes, "they involved school principals or superintendents who had a special duty of care regarding children in their respective school districts." See footnote 25 of the majority opinion. While I do not dispute that school officials owe a higher duty of care to schoolchildren who are on school property during school hours; see, e.g., *Burns* v. *Board of Education*, supra, 228 Conn. 649–50; the existence of a special duty of care does not seem particularly relevant when examining whether it would be apparent to a particular municipal official that his or her conduct creates an imminent risk of harm to an identifiable victim. In this case, the jury necessarily determined that the municipal official owed Hopkins a duty of care when it concluded that the official was negligent. As the majority makes clear during its analysis, "apparentness" requires the plaintiff to show that "*the circumstances* would have made it apparent to a reasonable government agent [that her conduct would create a risk of imminent harm to the plaintiff]." (Emphasis added.)

See footnote 14 of the majority opinion. The level of duty owed by the official is not relevant to that analysis.

Similarly, I do not agree with the majority that *Purzycki* addressed only the "imminence" prong of the exception and is, therefore, irrelevant to this court's understanding of the "apparentness" prong in the present case even if the majority is correct that the only issue on appeal was the "imminence" prong of the exception. In *Purzycki*, the jury had already found in favor of the plaintiffs but the trial court entered a directed verdict in favor of the defendants, having concluded that the plaintiffs had failed to prove that the plaintiff child was subject to imminent harm. *Purzycki* v. *Fairfield*, supra, 244 Conn. 105. The court noted that "because the material facts of the case are undisputed, the question presented here is one of law." Id., 108 n.4. Thus, in *Purzycki*, as in this case, the court exercised plenary review as to whether the exception applied, and unlike this case, it does not appear, as the majority contends, that the parties in *Purzycki* agreed that the only issue pertained to the "imminence" prong. In fact, both the arguments made by the parties in that case and the analysis set forth by this court seem to suggest that both the "identifiable victim" and "apparentness" prongs of the analysis were scrutinized. Before discussing imminence, the court first made it plain that the plaintiff child was considered an "identifiable person." Id., 108–109. Although not set forth separately, both the parties in *Purzycki* and this court evidently folded the question of "apparentness" into the question of imminent harm.[11] For example, the defendants in *Purzycki*, urging affirmance of the ruling of the lower courts, noted that "this type of harm [suffered by the plaintiff child] had not previously occurred during the twenty-two year time period in which the same level of supervision had occurred. . . . [T]he hallway itself harbored no dangers or defects." Id., 110. In addition, in making its determination that imminent harm existed, this court noted that "because the school administrators here had reason to foresee the danger that could occur on a daily basis, the harm in the present case was not as remote a possibility as was the harm in *Evon* [v. *Andrews*, 211 Conn. 501, 559 A.2d 1131 (1989)]." *Purzycki* v. *Fairfield*, supra, 111. The language contained within these passages pertains directly to the "apparentness" prong.[12] The analysis set forth by this court in *Purzycki* should not, therefore, be discounted so quickly by the majority.

The majority correctly observes that the justification for qualified immunity is that it avoids excessive exposure to liability so that municipal officials are not discouraged from taking action for fear of retaliatory lawsuits. I worry, however, that this court's refusal to apply the identifiable person-imminent harm exception in cases such as this one sends the wrong message to our municipalities. By concluding that the circum-

stances would not have made it apparent to a reasonable dispatcher in Vece's position, this court, in my view, minimalizes evidence contained within the record which indicates that a properly trained dispatcher would not have acted in the same manner as Vece after discovering Vincent's intent to chase the car that hit him. Thus, the town is insulated from liability *not* because Vece made a split second determination between two equally defensible choices, but because she was blind to a risk that a more competent dispatcher would have appreciated. Finding that the town is entitled to immunity under such circumstances does not encourage the measured use of judgment or discretion, rather, it encourages municipalities to engage in wilful blindness to dangers that might be prevented through the institution of better training programs. I agree with former Chief Justice Peters' dissent in *Shore* v. *Stonington*, supra, 187 Conn. 162, in that I also believe that our decision to recognize the identifiable person-imminent harm exception to qualified immunity "signalled a change, such as has occurred in our sister jurisdictions, in the law governing the liability of public officers and of the municipalities that bear the ultimate responsibility for their negligence." Sometimes, in order to improve the basic safety of its citizenry, a municipality must be held responsible for the poor judgment of its employees when carrying out discretionary acts. Such responsibility encourages our municipalities to be vigilant in their hiring practices and vigorous in their training programs. A refusal to apply the identifiable person-imminent harm exception in a case such as this one encourages neither practice.

In the end, this case turns on the level of background knowledge and training that one would impart to a reasonable dispatcher in the position of Vece. Cases such as *Burns* and *Purzycki* indicate that courts should consider circumstances that would have made the risk of imminent harm apparent to a reasonable official in the place of the actual official, even if those same circumstances did not actually alert the specific official in question. In my opinion, a reasonable jury could have concluded that a reasonable dispatcher in Vece's position would have been aware of the inherent risks in allowing the victim of a hit and run to pursue the offending vehicle—at any speed. Accordingly, I would affirm the judgment of the trial court. Therefore, I respectfully dissent.

[1] The majority frames the test for "apparentness" as whether "the circumstances would have made the government agent aware that his or her acts or omissions would likely have subjected the victim to imminent harm. . . . This is an objective test pursuant to which we consider the information available to the government agent at the time of her discretionary act or omission." (Citation omitted; footnote omitted.) In a footnote, the majority clarifies that "[w]e do not ask whether the government agent actually knew that harm was imminent but, rather, whether the circumstances would have made it apparent to a reasonable government agent that harm was imminent." See footnote 14 of the majority opinion. I understand the majority's test to mean that, in the present case, one should inquire as to whether the circumstances would have made the risk of imminent harm apparent

to a reasonable government agent in the position of the actual government agent.

[2] The Clinton Volunteer Fire Department and William Cardillo were also named as defendants in the present case. As the majority notes, however, these defendants have not actively participated in the present appeal. See footnote 3 of the majority opinion.

[3] In view of my conclusion that a 911 dispatcher should always tell a civilian motorist to stop a pursuit, I am not convinced that Vece did not have a ministerial duty to order Vincent to cease his pursuit, particularly in light of the complete absence of any written policy or directives for dispatchers in the town when dealing with a citizen pursuit after a hit and run. In the present case, however, because both parties concede that Vece was performing a discretionary act, I limit my analysis in this dissent solely to whether the identifiable person-imminent harm exception to discretionary act immunity applies. See *Ugrin* v. *Cheshire*, 307 Conn. 364, 398, 54 A.3d 532 (2012) (*Eveleigh, J.*, concurring and dissenting).

[4] I note preliminarily that this statutory section was not at issue in *Shore*. In that case, the statute at issue stated: "Any town . . . notwithstanding any inconsistent provision of law . . . shall pay on behalf of any employee of such municipality . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property, except as hereinafter set forth, if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty." (Internal quotation marks omitted.) *Shore* v. *Stonington*, supra, 187 Conn. 148 n.1, quoting General Statutes (Rev. to 1981) § 7-465.

[5] General Statutes § 52-557n (a) (1) provides in relevant part: "Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . ."

[6] The usefulness in this conceptualization of the interplay between negligence and governmental immunity is illustrated in a case such as this one. The jury had previously established that the defendant town's municipal employee was 90 percent at fault for the plaintiff's conserved person's injuries. Under my conceptualization of the interplay between negligence and governmental immunity, regardless of whether governmental immunity applies, a jury's determination of fault remains constant—instead the relevant issue becomes whether the municipality will be *liable* for the employee's negligence, not whether the employee was at fault at all. The majority suggests because the identifiable person-imminent harm exception to discretionary act governmental immunity does not apply in the present case, the municipal employee did not owe the plaintiff a duty to act at all. Under the majority's approach, having concluded that the identifiable person-imminent harm exception to governmental immunity does not apply, it apparently must also conclude that the jury's apportionment of fault was also invalid. This determination has implications not only for the plaintiff and the defendant town, but also the other parties involved in the accident, as a different apportionment of fault is now required.

[7] I do not mean to insinuate that the court in *Doe* invented new language. Indeed, this court used the same language to describe this exception in earlier opinions. See, e.g., *Shore* v. *Stonington*, supra, 187 Conn. 153 ("[w]e have recognized the existence of [a duty of a public official to act] where it would be apparent to the public officer that his failure to act would be likely to subject an identifiable person to imminent harm" [citing *Sestito* v. *Groton*, 178 Conn. 520, 528, 423 A.2d 165 (1979)]); *Evon* v. *Andrews*, 211 Conn. 501, 505, 559 A.2d 1131 (1989) ("[t]he immunity from liability for the performance of discretionary acts by a municipal employee is subject to three exceptions . . . first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm." [citing *Sestito* v. *Groton*, supra, 528]); *Purzycki* v. *Fairfield*, supra, 244 Conn. 108 ("'[o]ur cases recognize three [exceptions to qualified immunity for discretionary acts]: first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm'" [quoting *Burns* v. *Board of Education*, supra, 228 Conn. 645, and

*Evon* v. *Andrews*, supra, 505]). *Doe* is, however, the first opinion of this court to split this language out into three distinct elements. See *Doe* v. *Petersen*, supra, 279 Conn. 616 ("Discretionary act immunity is abrogated when 'the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . .' [*Evon* v. *Andrews*, supra, 505]. By its own terms, [the test for the identifiable person-imminent harm exception] requires three things: [1] an imminent harm; [2] an identifiable victim; and [3] a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm.").

[8] The town also challenged whether the dispatcher's negligence was the proximate cause of Hopkins' injuries. I would also affirm the lower court's refusal to overturn the jury's verdict on this issue, but in light of the majority's ruling on the applicability of the identifiable person-imminent harm exception, I do not analyze this issue in detail.

[9] I respectfully disagree with the majority's conclusion that a reasonable dispatcher in Vece's position would have no notice that Vincent was attempting to assist the police in apprehending the vehicle that hit him. Throughout more than four minutes of conversation between Vincent and Vece are instances of Vincent: (1) providing Vece with identifying information of the car that required Vincent to keep the car in sight, such as the license plate number Hopkins' car, or (2) providing Vece with updates as to the location of the Hopkins' car. Indeed, the only conceivable purpose for Vincent's actions was to relay additional information to the police, through Vece, that would ensure the apprehension of that vehicle. This reasoning is bolstered by the fact that Vece actually relayed this information to the police as she received it from Vincent.

[10] The majority suggests that my analysis focuses on the standard of care for a reasonable dispatcher when determining whether the imminent risk created by Vece's negligence would have been apparent to a reasonable dispatcher. To clarify, it is the following statement, made by Vincent one second into the call, that would have made the situation unfolding apparent to a reasonable dispatcher: "I just got hit by a motor vehicle and . . . he just took off and I'm trying to catch up to him to get his plate." That statement, which was indisputably relayed to Vece, contains the specific information that, relayed to a reasonable dispatcher, would convey that a car chase between two private citizens is occurring. This statement would have raised alarm bells to a reasonable dispatcher because dispatchers are made aware of the risks involved in citizen car chases—namely, erratic driving and provocation of the chased vehicle. The testimony of both Dzoba and Vece on this point is consistent. The point at which they differ is that Dzoba's testimony, which the jury was free to credit, indicated that such risks would be immediately apparent to a reasonable dispatcher after hearing a statement like the one made by Vincent. In my view, the fact that Dzoba could not pinpoint from the tape the precise second at which the imminent risk of harm was *actually* created as a result of Vincent's pursuit is too narrow a view of the "apparentness" prong. The tape sufficiently conveyed that a risk of harm was imminent if Vincent did not cease his pursuit, and in my opinion that is all that is required to meet this prong of the identifiable person-imminent harm exception.

[11] This may be due to the fact that *Purzycki* was decided before *Doe*, the first opinion to set out the identifiable person-imminent harm exception as a three-pronged test. See footnote 7 of this dissenting opinion. Thus, the mere fact that the court in *Purzycki* did not address each "prong" of the current test individually should not, in my opinion, serve as grounds to immediately dismiss the opinion as lacking precedential value in determining the meaning of "apparentness."

[12] I also note that this court has previously characterized *Purzycki* as "faithfully recit[ing] *and* appl[*ying*] the 'apparentness' requirement." (Emphasis added.) *Doe* v. *Petersen*, supra, 279 Conn. 619, citing *Prescott* v. *Meriden*, 273 Conn. 759, 763, 873 A.2d 175 (2005), *Purzycki* v. *Fairfield*, supra, 244 Conn. 108, *Burns* v. *Board of Education*, supra, 228 Conn. 645–46, and *Evon* v. *Andrews*, supra, 211 Conn. 505.